## In re CARDINAL INDUSTRIES, INC.

### In Joint Administration With

### Cardinal Industries of Florida, Inc. Debtors.

**Bankruptcy Nos. 2–89–02779, 31–4427382 and 58–1419022.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Nov. 29, 1989.

See also, Bkrtcy., 109 B.R. 738.

Joseph C. Winner, Casey, McFadden & Winner, Columbus, Ohio, for The Federal Home Loan Mortg. Corp.

David G. Heiman, Fordham E. Huffman, Jones, Day, Reavis & Pogue, Columbus, Ohio, for Cardinal Industries, Inc. and Cardinal Industries of Florida, Inc.

Charles M. Caldwell, U.S. Trustee Office, Columbus, Ohio, Asst. U.S. Trustee.

## ORDER ON DEBTOR'S MOTION FOR INJUNCTIVE RELIEF AGAINST THE FEDERAL HOME LOAN MORTGAGE CORPORATION

BARBARA J. SELLERS, Bankruptcy Judge.

### I. PRELIMINARY MATTERS

This matter is before the Court on a Motion for Injunctive Relief (the "Motion"), filed by Cardinal Industries, Inc. ("CII") and Cardinal Industries of Florida, Inc. ("CIF") (collectively the "Debtors"). The Motion seeks to have this Court enjoin certain actions of The Federal Home Loan Mortgage Corporation (the "Lender"). The Motion was opposed by the Lender and was heard by the Court. Because of certain time exigencies, an oral decision was communicated to the parties on November 2,

1989. This order restates and supports that determination.

The Court has jurisdiction in this matter under 28 U.S.C. § 1334(b) and the General Order of Reference previously entered in this district. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) which this Court may hear and determine. The procedure by which the relief requested is sought is authorized by previous order of this Court. *Cardinal Industries, Inc. v. Buckeye Federal Savings & Loan Association (In re Cardinal Industries, Inc.)*, 105 B.R. 834, 857 (Bankr.S.D.Ohio 1989) (Findings of Fact and Conclusions of Law on Motions for Class Certification, Preliminary and Final Injunctive Relief, and Complaint Seeking Declaratory and Injunctive Relief).

The Debtors' Motion seeks to have the Lender enjoined from proceeding with foreclosure sales of certain real properties which are owned by five limited partnerships of which either CII or CIF is the managing general partner. The partnerships are Ashgrove Apartments of Dekalb County, Ltd. ("Ashgrove"), Brandon Court Apartments of Warner Robins, Ltd. ("Brandon Court"), Laurel Glen Apartments of Acworth, Ltd. ("Laurel Glen"), Oakley Shoals Apartments of Atlanta, Ltd. ("Oakley Shoals") and Shannon Woods of Union City, Ltd. ("Shannon Woods"), (collectively the "Partnerships"). Oakley Shoals and Laurel Glen each have as their only limited partner a subsidiary of one of the Debtors. Certain third party investors are the limited partners of Ashgrove, Brandon Court and Shannon Woods. The foreclosure sales sought to be enjoined were to be scheduled for early December, 1989.

The basis asserted by the Debtors for the relief sought is that the Lender's foreclosure actions will have a detrimental impact on the Debtors' reorganization efforts and will deny the Debtors a meaningful opportunity to avail themselves of the Chapter 11 remedy. That result is denied by the Lender.

## II. BACKGROUND FOR THE RELIEF SOUGHT

■ This Court believes that neither the size nor the complexity of a debtor's business structure should preclude the availability of a bankruptcy reorganization remedy if such remedy is desired, required and possible. One of the most important components of that remedy is an initial breathing space during which a debtor can evaluate its future path, determine which assets it should retain and decide where its future focus will lie. That breathing space is built into the Bankruptcy Code. The meaningfulness of that space, however, often depends upon cooperation from its secured lenders. Even if such lenders are not successful in the early stages of a case in obtaining relief from the automatic stay to continue their state court proceedings against interests of the debtor, the battle for such relief can drain a debtor's resources and divert its energies from the reorganization process.

These jointly-administered cases are especially egregious examples of that process because the Debtors have not only their own respective secured lenders with whom they must negotiate and make accommodation, but one or the other of the Debtors serves as the managing general partner in approximately 1,000 limited partnerships in 20 different states. Each of those partnerships has its own secured lender. Most of those partnerships are in default of payments to their respective lenders and many of those defaults occurred, in part, because CII diverted funds from certain partnerships allegedly to repay corresponding obligations to CII.

Large numbers of the partnership lenders are aggressively seeking to enforce their rights against the partnership properties which, in turn, provide the primary source of cash flow to CII and CIF and their subsidiaries. Putting any significant number of those partnerships into Chapter 11 cases will have the effect of further draining the Debtors' limited resources and will change the focus from a negotiating process to a litigation forum, aggravated by mortgage and loan agreements which authorize each lender to charge the resulting attorney's fees back to the partnerships. If every nuance of the entity theory

is enforced in the context of these cases, the Court believes these Debtors effectively have no Chapter 11 remedy.

In an earlier action this Court held that the provisions of the automatic stay imposed by 11 U.S.C. § 362(a), with one exception, did not extend in these Debtors' cases to protect the partnership properties from foreclosures by their lenders and that injunctive relief could not be granted on a class-wide basis. *Cardinal Industries, Inc. v. Buckeye Federal Savings & Loan Association, (In re Cardinal Industries, Inc.),* 105 B.R. 834 (Bankr.S.D.Ohio 1989). Because certain of the partnership properties may have significant value to the Debtors' reorganization effort, the Court authorized a procedure by which the Debtors could seek injunctive relief on a property by property basis where such relief was appropriate. That relief was to be a substitute for the class-wide injunctive relief requested in the adversary action. However, any injunctive relief to be granted would be merely to prevent precipitous removal by foreclosure of a particular property the Debtors had determined was essential to their future economic viability, but as to which no negotiated settlement had been reached. Such relief was to be granted only on a showing of supporting facts relating to a specific property and was to be of relatively short duration to provide time for the Debtors, as managing general partners, to resolve by negotiation their problems with several hundred institutional lenders.

Any relief available through the Alternative Procedure, as it has both fondly and derisively been called, was never intended to be, nor could it be, a permanent solution to problems which, in the context of these Debtors' cases, could only be solved by negotiation, foreclosure or resort to specific partnership Chapter 11 filings. Nor could any such injunctions authorize the "cram down" of partnership lenders in the general partner's case or the discharge of obligations of the partnerships unless a lender consented to such an arrangement. The only purpose for the injunctive relief, as sought by the Debtors originally in the class action and procedurally managed by the Court, is to give the Debtors time and space to enter into whatever agreements they can negotiate on behalf of partnerships where the cash flow from properties is essential to fund these Debtors' ongoing operations, to repay obligations of those partnerships to the Debtors, or to enable the Debtors to propose a plan of reorganization which could withstand the feasibility test for confirmation. It further was intended to force the Debtors to pay attention to the needs of smaller lenders whose own resources may be severely impacted by their troubled partnership loans, but whose impact in these cases may not be significant enough to compel priority attention from the Debtors at the negotiating table. From what the Court has observed in the first "rounds" of the Alternative Procedure process, that procedure may be useful and may provide an orderly method for addressing in a centralized forum the initial short-term fate of specific partnership properties without requiring large numbers of Chapter 11 filings simply as an emergency defensive mechanism.

## III. JURISDICTION AND EQUITY POWERS OF THE BANKRUPTCY COURT TO PROTECT THE REORGANIZATION PROCESS

 Case law has established that a Bankruptcy Court has power to protect a reorganization effort pending before it from detrimental pressure by third parties even where such pressure is against an entity not the debtor. *See Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.),* 25 B.R. 1018 (D.N.M.1982). Likewise, if an asset sought to be liquidated by a third party is to be a source of funds for a debtor's reorganization, injunctive relief to protect that source can be considered by the Bankruptcy Court. *In re Monroe Well Service, Inc.,* 67 B.R. 746 (Bankr.E.D.Pa.1986).

 The jurisdiction of the Bankruptcy Court no longer is limited to an *in rem* basis dependent upon actual or constructive possession of property of the bankruptcy estate. Rather, the Court's jurisdic-

tion was expanded under the Bankruptcy Reform Act of 1978 to include *in personam* actions which arise in a bankruptcy case, under the bankruptcy laws, or by relationship to a bankruptcy case. 28 U.S.C. § 1334. Such expansion includes the power to enjoin a third party's actions against non-estate property where such actions seriously impair a debtor's reorganizational efforts or so disrupt its operations that reorganization efforts cannot be meaningful. *See Lesser v. A–Z Associates (In re Lion Capital Group),* 44 B.R. 690, 703 (Bankr.S.D.N.Y.1984). It is not merely a showing of indirect effect upon a debtor which gives rise to the power to issue a stay, however. Evidence of direct adverse or detrimental impact upon the reorganization and the estate must be demonstrated. *Lion Capital,* 44 B.R. at 703; *Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.),* 21 B.R. 777, 778, *reh'g denied,* 21 B.R. 645 (Bankr.D.N.M.1982), *aff'd,* 25 B.R. 1018 (D.N.M.1982).

The existence of power to enjoin certain actions, however, does not mean that such injunctions should issue freely or without insistence upon strong proof of harm to a debtor, balanced by consideration of the effect such injunctive relief might have upon the rights of the party subject to those commands. *See Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936). Although broad construction of the jurisdictional grant in 28 U.S.C. § 1334 embraces matters shown to have conceivable effect upon the reorganization and provides the jurisdictional nexus under *Kelley v. Nodine (In re Salem Mortgage Co.),* 783 F.2d 626, 634 (6th Cir.1986), such impact alone is not the test for whether an injunction should issue on the facts of a particular matter. That determination, under 11 U.S.C. § 105(a) and Bankruptcy Rule 7065, requires the Court to apply the usual standards for the issuance of injunctive relief. *Lahman Manufacturing Co., Inc. v. First Nat'l Bank of Aberdeen (In re Lahman Mfg. Co., Inc.),* 33 B.R. 681 (Bankr.D.S.D. 1983).

## IV. THE ISSUANCE OF INJUNCTIVE RELIEF

### A. *Generally*

The standards for the issuance of injunctive relief in this district have been set forth by Judge Porter as follows:

The traditional standards governing preliminary injunctions under Federal Rule of Civil Procedure 65 are applicable for a § 105 injunction. The Sixth Circuit has specified four factors which are particularly important in determining whether a preliminary injunction is proper: "(1) the likelihood of plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction." These four factors are to be balanced; they are "not prerequisites that must be met." Nor is any single factor "determinative as to the appropriateness of equitable relief."

*Baldwin–United Corp. v. Paine Webber Group, Inc. (In re Baldwin–United Corp.),* 57 B.R. 759, 766 (S.D.Ohio 1985) (citations omitted).

The specific source for the issuance of stays or injunctions for situations not within the scope of the automatic stay is found in § 105 of the Bankruptcy Code. 11 U.S.C. § 105(a). Section 105(a) provides that "the Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." And the legislative history of this section states:

The court has ample ... powers to stay actions not covered by the automatic stay. Section 105 ... grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity.... Stays or injunctions issued under these other sections will not be automatic upon commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions.... Thus, the court will have to determine

whether a particular action which may be harming the estate should be stayed. S.Rep. No. 95–989, 95th Cong., 2d Sess. 51 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5837; H.Rep. No. 95–595, 95th Cong., 1st Sess. 341 (1977) ("House Report"), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6298.

### B. *Specific Factors*

1. Likelihood of Success on the Merits

■ Many cases have interpreted "success on the merits" in the context of injunctive relief in a Chapter 11 case to mean "the probability of a successful plan of reorganization." *See e.g. Baldwin–United*, 57 B.R. at 767. While this Court believes that the issuance of an injunction would be improper without some showing of a likelihood that the Debtors will be able to reorganize, such showing alone will not satisfy that factor in the context of this injunctive request against a partnership lender. There also must be a demonstration that keeping a particular partnership property from foreclosure sale either will produce significant value to one of these estates which will be made available for creditors of these Debtors or will result in a significant decrease in claims otherwise asserted against these estates.

■ In this matter, the Debtors were able to demonstrate that they have a meaningful chance to successfully reorganize. While that showing was not made with great detail, at this stage in these very large Chapter 11 cases, the evidence adduced was sufficient. *See United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

For each property, the Debtors also attempted to show value to their estates. Specifically, the value from Laurel Glen and Oakley Shoals is to come from anticipated sales of those properties as part of a sale of multiple properties to a particular buyer. That sale is currently in its early contract stage and is expected to provide significant values to the partnerships which own those properties. It is further expected that after payment of unsecured creditors of those partnerships, funds will remain which could become available to one of the Debtors and its wholly-owned subsidiary on account of their respective general and limited partner interests.

The Debtors asserted that value from Ashgrove, Brandon Court and Shannon Woods would flow as demonstrated by certain ten year projections of cash flow from those properties. Those projections were prepared by Kenneth Levanthal & Co., and have been updated by an employee of CII.

For Ashgrove the projections show a proposed refinancing of the mortgage debt in 1993. That refinancing is anticipated to generate sufficient funds to pay the first mortgage obligation to the Lender and $420,000 for repayment of an unrecorded second mortgage in favor of CII's subsidiary, Cardinal Industries Service Corp. ("CISC") and certain operating advances also apparently made by CISC. The property is to be sold in 1998 or before. The Lender has no recourse to the partnership nor any guaranty from either of the Debtors.

For Brandon Court, the projections also contemplate a sale of the property in 1998 in an amount sufficient to pay the Lender in full and complete payment of the interest and principal on a second mortgage held by CISC and an operating advance also from CISC. Total funds to be paid CISC will be approximately $1,097,000. That projection further assumes an extension and reamortization of the Lender's obligation. The Lender has no recourse against the partnership nor any guaranty by either of the Debtors.

Finally, with regard to Shannon Woods, the projections indicate that a sale in 1997 will realize sufficient funds to pay the Lender in full and complete payment of the interest and principal on a second mortgage note held by CISC and an operating advance to that same entity. The total funds generated for CISC over time are estimated at $136,000.00 and a reamortization of the Lender's existing loan is assumed. The Lender has no recourse against the partnership nor any guaranty from either of the Debtors.

Based upon these facts, the Court finds that the Debtors have shown a likelihood of success on the merits with regard to Laurel Glen and Oakley Shoals as those properties may be sold within a relatively short time for a price which should bring funds into the general partners' estates. Such showing has not been made for Ashgrove, Brandon Court or Shannon Woods, however.

Without engaging in the process of verifying the assumptions and calculations underlying the projections, the evidence established that even if such assumptions and calculations were correct, all value flowing from those properties went to CISC rather than to either of the Debtors before this Court. Despite the Debtors' assertions that such funds would flow through CISC to CII and that the funds used for the loans had come originally from CII, no requirement for such pass-through was established. Nor was there any evidence of the impact of those assertions upon whatever rights creditors of CISC might have to those funds prior to the rights of CII as CISC's shareholder. As this Court previously has held, a partnership lender will not be enjoined from proceeding against a partnership property where the primary or overwhelming benefit from such an injunction would flow to a subsidiary of one of the Debtors which is not before this Court as a debtor. *Cardinal Industries, Inc. v. Buckeye Federal Savings & Loan Assoc. (In re Cardinal Industries Inc.)*, 102 B.R. 991, 1008 (Bankr.S.D.Ohio 1989). Not only would the issuance of such an injunction not be factually justified, but the jurisdictional nexus may be lacking for the exercise of this Court's powers where the impact of the Lender's actions primarily affects the Debtors' subsidiaries.

### 2. Irreparable Harm

The second factor the Court must consider in determining whether to enjoin the Lender's actions is whether failure to issue such an injunction will cause irreparable harm. That showing requires the Debtors to demonstrate not only that the property will be lost to its affiliate partnership by the foreclosure, but that such loss will be a direct injury to one of these Debtors and to their reorganization efforts. If the property is incapable of generating sufficient income to pay its operating expenses and to amortize a reasonable mortgage debt, its loss cannot be irreparable injury. Further, even if the property's ability to generate income is sufficient to pay its operating expenses and mortgage, if the Debtors are unable to show that the partnership will be able to repay loans it may have from one of the Debtors or to distribute to its general partner significant sums on account of that partner's partnership interest, the injury occasioned by the loss of the property may not be irreparable in the absence of a loss of some other kind.

Conversely, the Lender's mere assertion that the Debtors could always cause a Chapter 11 case to be filed for the Partnership will not negate the showing of irreparable injury. Nor does the fact that damages could replace the lost value cause the injunctive request to be inappropriate as asserted by some lenders. The harm not compensable at law is the negative impact and effect upon the Debtors' reorganization effort.

In this matter the Debtors were able to demonstrate that irreparable harm would be caused if the Laurel Glen and Oakley Shoals properties were taken by foreclosure prior to the conclusion of ongoing efforts to sell these properties. For reasons previously stated, it appears to the Court that a sale is possible which may be closed within a reasonable time. Accordingly, permitting foreclosure to proceed at this time against those two properties would irreparably harm the Debtors.

No such irreparable harm was shown for Ashgrove, Brandon Court or Shannon Woods. Indeed, no showing was made of value to these Debtors if those properties remained in the partnerships. Therefore, the balance of this factor for those three properties favors the Lender.

### 3. Harm to the Lender

The third factor to be considered when determining whether an injunction should issue involves an assessment of the harm

which is likely to fall to the Lender against whom the injunction may issue. That harm then must be balanced against the injury to the Debtors if the relief is denied. In this context that consideration involves an analysis of several factors, including the extent of present arrearage to the Lender, how soon any default in those loan payments can be cured, the Lender's original expectations for long or short term involvement with these Debtors, results of recent "pass-through" provisions for available cash, the degree of default in real estate taxes, the value of the property as compared to the outstanding balance of the loan, the condition of the property as managed by certain of the Debtors' subsidiary corporations, the effect of any existing receiver's presence, the effect of the delinquent loan upon the Lender's loan portfolio or regulatory requirements and other factors applicable to the particular property.

For Laurel Glen and Oakley Shoals the delinquency to the Lender in principal, interest, taxes and insurance ("PITI"), exclusive of late fees, attorney's fees or default interest, is approximately $37,000.00 and $34,000.00 respectively. The properties are in favorable locations and the pass-through provisions actually have reduced the Lender's pre-petition PITI arrearage. The current value of the properties exceed the mortgage obligation balances and revised assumptions based upon recent actual performance for Laurel Glen's future performance are more favorable than the Levanthal projections. Occupancy rates are high, the original loan terms extend to 1997 and the condition of both properties is good. Such assessments mean that granting the Debtors a limited period to complete the proposed sale of these non-syndicated properties should result in little or no injury to the Lender.

Based upon the Court's earlier findings that neither likelihood of success on the merits nor irreparable harm to these Debtors has been shown for Ashgrove, Brandon Court or Shannon Woods, the Court will not, at this time, analyze the harm to the Lender from staying foreclosure sales of those properties.

4. Impact Upon The Public Interest

Impact upon the public interest if the requested injunction is denied or granted is not significant in the analysis of these injunctive requests. Therefore, this factor is given little weight by the Court.

## IV. CONCLUSION

Based upon the foregoing, the Court determines that the Debtor's Request for Injunctive Relief should be, and the same is hereby granted, with respect to Laurel Glen and Oakley Shoals. The Federal Home Loan Mortgage Corporation is enjoined from proceeding with its scheduled foreclosure sales of the real properties owned by those two partnerships for a period of 90 days from November 2, 1989. With regard to Ashgrove, Brandon Court, and Shannon Woods the Debtors' request for injunctive relief is denied.

IT IS SO ORDERED.