609 A.2d 768

IN THE MATTER OF THE REHABILITATION OF MUTUAL
BENEFIT LIFE INSURANCE COMPANY.

Superior Court of New Jersey
Appellate Division

Argued June 2, 1992—Decided July 8, 1992.

Before Judges O'BRIEN, HAVEY and CONLEY.

*Marc S. Friedman* argued the cause for appellant Maryland National Bank (*Friedman Siegelbaum; Weinberg & Green,* attorneys; *Helene H. Wingens, Carl E. Eastwick, Earl F. Leitas* and *Marc S. Friedman,* on the brief).

*Gregory G. Little* argued the cause for appellant First Tennessee Bank National Association (*McCarter & English; Hunton & Williams,* attorneys; *William H. McBride, Jeffrey S. Norwood* and *Gregory G. Little,* of counsel and on the brief).

*Bruce D. Shoulson* argued the cause for appellant Citizens & Southern National Bank of South Carolina (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys; *Bruce D. Shoulson,* of counsel; *Gary F. Eisenberg,* on the brief).

*Jack M. Sabatino,* Assistant Attorney General, and *Michael S. Meisel,* Special Counsel, argued the cause for respondent Samuel F. Fortunato, Commissioner of Insurance and Rehabilitator of Mutual Benefit Life Insurance Company (*Robert J. Del Tufo,* Attorney General of New Jersey; *Cole, Schotz, Bernstein, Meisel & Forman, P.A.,* and *Cadwalader, Wickersham & Taft,* attorneys; *Joseph L. Yanotti,* Assistant Attorney Gen-

eral, *Michael S. Meisel* and *Mitchell I. Sonkin,* of counsel; *Sharon M. Hallanan,* Deputy Attorney General, *Gregory M. Petrick, Joan S. Stumpf, Steven R. Klein,* on the briefs).

The opinion of the court was delivered by

CONLEY, J.S.C. (temporarily assigned).

On leave granted, First Tennessee Bank National Association, Maryland National Bank and Citizens and Southern National Bank of South Carolina appeal two interlocutory orders of the Chancery Division entered December 12, 1991 restraining them from foreclosing against certain out-of-state property in which Mutual Benefit Life Insurance has an interest both directly and through a wholly owned subsidiary and the financing for which it is a guarantor. Appellants are out-of-state indenture trustees of bonds issued in connection with these properties. The restraints were issued in response to a proceeding commenced by the Commissioner of Insurance, with the consent of Mutual Benefit Life (MBL) and pursuant to *N.J.S.A.* 17B:32-1 to 23, for the rehabilitation of MBL. We affirm.

By order entered July 16, 1991, the Commissioner was appointed as MBL's Rehabilitator and authorized to exercise "all the powers and authority expressed or implied under the provisions of *N.J.S.A.* 17B:32-1 *et seq."* In order to preserve the business and property of MBL pending rehabilitation, the order further authorized the Commissioner to: (1) take possession of MBL's real and personal property "of any nature"; (2) conduct its business; and (3) remove the causes and conditions which had made rehabilitation necessary. The order restrained "all ... persons or entities of any nature" from, among other things: (1) bringing or maintaining any action against MBL; (2) making or executing any levy upon MBL's property; (3) selling, transferring, wasting or otherwise disbursing or disposing of or encumbering the assets and property of any nature of MBL except as directed by the Rehabilitator or ordered by the court; and (4) interfering in any way with the Commissioner's dis-

charge of his duties as Rehabilitator. There was a separate provision specifically enjoining "[a]ll secured creditors or parties, pledgees, lien holders, collateral holders, or other persons claiming secured, priority or preferred interests in any property or assets of MBL including any governmental entity" from taking any steps "whatsoever" to transfer, sell, encumber, attach, dispose or exercise "purported" rights in or against any property or assets of MBL.

On August 7, 1991, the trial judge entered an order reaffirming the Commissioner's authority to act as Rehabilitator until further order of the court. The restraints in the July 16 order were continued on an interlocutory basis, with certain modifications relating to policy loans and the Rehabilitator's efforts to sell MBL's "group business." The August 7, 1991 order included a separate paragraph governing "hardship distributions" and a separate paragraph enabling parties in interest to file "any application for relief" with the Commissioner and, if dissatisfied with the Commissioner's decision, to obtain review thereof by the trial judge.

Following this order, the Commissioner sought a determination as to whether the July 16 and August 7 restraints applied to real estate partnerships in which MBL and its subsidiary had an interest and for which MBL had guaranteed partnership indebtedness. Pursuant thereto, on October 16, 1991, an order to show cause returnable October 30, 1991 was entered with further temporary restraints specifically enjoining all indenture trustees acting on behalf of bondholders from "commencing or continuing foreclosure actions or other litigation against, or interfering with the property of: (i) real estate partnerships owned in whole or in part by the Mutual Benefit Life Insurance Company in Rehabilitation, or by its wholly owned subsidiary, Muben Realty Company, and (ii) real estate partnerships for which Mutual Benefit Life Insurance Company is a guarantor of partnership indebtedness...."

On the return date, appellants and a number of other out-of-state banks, acting in their capacity as trustees for the bondholders who had financed real estate projects located outside New Jersey, opposed the motion.[1] Following extensive arguments on the motion, the trial judge issued a written opinion in which he granted respondent's motion, concluding that the trustees were temporarily restrained from instituting any action with respect to: (1) property owned by a partnership in which MBL or Muben Realty Company (Muben) had an interest or (2) property owned by a partnership the indebtedness for which MBL had issued a guaranty. An order imposing such restraints was entered on December 12, 1991.

Also on December 12, 1991, a supplemental order was entered specifying that appellants could take action against MBL property in accordance with the relief provisions of the August 7, 1991 order. It further specified that appellants could commence actions under statutes similar to *N.J.S.A.* 17B:32–16 (§ 3 of the Uniform Insurers Liquidation Act), allowing claims against insurers to be presented to ancillary receivers in other states where such are appointed.

The critical facts are as follows. MBL, one of the largest insurance companies in the United States with over 400,000 policy holders, is domiciled in New Jersey and regulated by the New Jersey Commissioner of Insurance. Over the years it has invested $5 billion in real estate projects located throughout the United States. It holds and manages these investments through wholly-owned subsidiaries. Representing approximate-

---

[1]Prior to the trial judge's disposition of the Commissioner's motion, a "standstill agreement" was entered into by five trustees, acting on behalf of the bondholders in seventeen projects, agreeing to refrain from foreclosing on the properties financed by the bond issues or from pursuing any other remedy such as appointment of a receiver or perfection of a security interest in rents from the properties. The agreement is contingent upon the real estate partnerships maintaining debt service on the projects and reporting to the trustees on the financial condition of the projects.

362

·ly 50% of its investment portfolio, the Commissioner asserts these projects have been adversely affected by the economy.

Forty-four of MBL's various real estate projects in 15 states are financed by bonds issued by various state agencies for the construction of low and moderate income housing. In thirty-three of these projects, MBL, as a limited partner, and its wholly-owned subsidiary Muben, as a general partner, hold 50% or 100% ownership interests through limited partnerships. In the remaining eleven projects, MBL and Muben hold second mortgages through limited partnerships. MBL is a guarantor on the loan indebtedness of all forty-four partnerships.

Appellants are the indenture trustees for bonds issued by state agencies or housing authorities in Tennessee, Maryland and South Carolina, the proceeds of which were used to finance the real estate projects in question. In addition to MBL's guarantees, the housing authorities obtained mortgages on the properties to secure the authorities' loans to the partnerships. The authorities then assigned their rights under the mortgages and guarantees to appellants under the trust indentures.

Each guaranty, given by MBL "in consideration of the promises and in order to enhance the marketability of the Bonds and thereby achieve interest cost and other savings to the Developer and Guarantor and as an inducement to the purchase of the Bonds by all who shall at any time become owners of the Bonds," is "independent, absolute, irrevocable and unconditional...." In the event of default, the guaranty provides:

> ... the Trustee, as assignee of Administration, shall proceed first and directly against the Guarantor under this Guaranty without proceeding against or exhausting any other remedies which it may have and without resorting to any other security held by it, and in so proceeding against the Guarantor, no election of remedies shall be deemed made as to the Developer, the Deed of Trust or this Guaranty.

In the event of the exercise of the guaranty, the trustees are required to give notice to MBL at "520 Broad Street, Newark, New Jersey."

Entered into by MBL "for the benefit of the Administration and its successors or assigns," each guaranty specifically authorizes not only the Administration, but its successors and assignors to "enforce performance and observance of the Guaranty to the same extent as if they were parties signatory hereto." In recognition that the guaranty is given by "a corporation organized and existing under the laws of the State of New Jersey," each guaranty contains a specific representation that MBL:

> ... has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of New Jersey with full power and authority under the laws of the State of New Jersey to own its properties and conduct its business as the same is now being conducted. The Guarantor is duly qualified to do business as a foreign life insurance corporation and is in good standing as a foreign life insurance corporation in all jurisdictions (domestic and foreign) where such qualification is required if the failure so to qualify would have a material adverse effect upon the business or properties of the Guarantor other than the inability of Guarantor to pursue certain rights or remedies in the courts of such jurisdictions.

Each guaranty, significantly, specifically provides that the "execution, delivery and performance" of the guaranty would not conflict with "any existing law, rule, regulation, ordinance, judgment, order, decree or other legal requirement to which the Guarantor is subject." Obviously aware of the interrelationship between MBL as guarantor and its role in the partnerships with Muben, the guaranty further acknowledges that "Muben Realty Company, a general partner of the Developer, is a wholly owned subsidiary of a holding company of the Guarantor." Critically, the guaranty states "[t]his Guaranty shall be governed by the substantive laws of the State of New Jersey."

The specifics of each transaction involving MBL and appellants are as follows:

### First Tennessee Bank National Association

First Tennessee Bank National Association (First Tennessee) is the trustee under a trust indenture dated April 1, 1990 between the Health, Education and Housing Facility Board of Shelby County, Tennessee (Shelby) and Arbors of Hickory

Ridge, Ltd., (Hickory), developer of the Arbors of Hickory Ridge Apartments. Hickory is a Tennessee limited partnership in which Muben is the sole general partner and MBL the sole limited partner. Hickory executed a loan agreement with Shelby evidencing an indebtedness of $17,190,000, secured by a deed of trust and a security agreement (with assignment of leases and rents) on the apartments, in favor of Shelby and MBL. MBL guaranteed the $17,190,000 loan to Hickory. Shelby assigned its rights and interests in the loan, guaranty agreements and deed of trust to First Tennessee.

The entry of the July 16, 1991 rehabilitation order triggered a series of obligations under the agreement. On July 22, 1991, First Tennessee demanded that Hickory pay "the Purchase Price of Bonds tendered under the Indenture." When Hickory failed to do so, First Tennessee demanded MBL make accelerated payment under its guaranty agreement. Neither party was able to meet First Tennessee's demands, and their actions constituted a default under their respective agreements. However the debt service on the project was current at the time full payment was demanded and remains current. On July 24, 1991, First Tennessee, declaring the existence of a default and the balance immediately due and payable, filed a complaint and obtained appointment of a receiver in the Chancery Court for Shelby County, Tennessee on September 4, 1991.

### Citizens & Southern National Bank of South Carolina

Citizens & Southern National Bank of South Carolina (Citizens & Southern) is the corporate fiduciary for two series of South Carolina Housing Authority (South Carolina) Multifamily Mortgage Revenue Bonds. The proceeds of the bond issues were loaned, pursuant to trust indentures between South Carolina and Citizens & Southern, to two real estate partnerships—Paces Parklane Limited Partnership and Paces Watch Limited Partnership. Paces Parklane was loaned $12,050,000 and Paces Watch was loaned $10,600,000. Both developers constructed multifamily housing facilities in South Carolina with the loans.

Paces Parklane is a joint venture between MBL (a 47.5% limited partner), Muben (a 2.5% general partner), and Crow Parklane Limited Partnership (a 50% general partner). MBL and Muben have the same interest in Paces Watch, and the 50% general partner in that enterprise is Crow Shem Creek Limited Partnership.

Paces Parklane and Paces Watch have identical agreements with South Carolina and MBL. Pursuant to their loan agreements, each partnership is required to pay to South Carolina amounts sufficient to provide for timely payment on the bonds. Each partnership granted a mortgage on, security interest in, and an assignment of rents from its projects to South Carolina. MBL guaranteed the $22,650,000 loans through its guaranty agreements. South Carolina in turn assigned its rights under the loan agreements, mortgages and guarantees to Citizens & Southern.

The Paces Parklane and Paces Watch loan agreements both provide that a voluntary filing for the appointment of a receiver for MBL constitutes an "event of default" under the agreements. The loan agreements permit the default to be cured if the partnerships obtain alternate security within 90 days. This 90–day period expired on October 14, 1991, without the partnerships' obtaining the substitute security.

Unlike Tennessee, South Carolina has not yet taken any action with respect to the Paces Parklane and Paces Watch projects. However, it maintains that, to protect its bondholders, it must preserve its right to foreclose on the South Carolina properties should it determine this to be appropriate. An affidavit by Citizens & Southern's vice-president states "[b]y opposing MBL's application, CSSC is not currently seeking to institute an action against MBL to enforce its guaranty. CSSC simply seeks to preserve its right to institute an action to enforce its rights in the Projects to obtain partial satisfaction of the Developers' payment obligations and thereby also mitigate the claims which it may be required to assert against MBL."

*Maryland National Bank*

Maryland National Bank (Maryland National) is the successor trustee, by merger, to Equitable Bank, N.A., under two trust indentures, dated November 1, 1985, between Equitable and the Maryland Department of Housing and Community Development. The indentures related to the issuance of two sets of bonds: (a) the Chase Ridge bonds ($26,815,000) and (b) the Chase Lea bonds ($16,835,000). The proceeds of the bonds were loaned to two Maryland limited partnerships, Chase Ridge Ltd. and Chase Lea Ltd. The general partners of Chase Ridge are Crow Ridge Limited Partnership, a Maryland limited partnership (50% interest), and Muben (2.5% interest). MBL is the sole limited partner (47.5% interest). MBL and Muben have the same interests in Chase Lea, also a Maryland limited partnership, with the 50% general partner in that entity being Chase Lea Limited Partnership, a Virginia limited partnership. MBL guaranteed the $43,650,000 loans pursuant to its guaranty agreements with the Department of Housing and Community Development, which assigned its interests to the trustee.

The New Jersey rehabilitation order triggered an obligation under the loan agreements signed by Chase Lea and Chase Ridge to replace MBL as their guarantor within 90 days. This 90–day period expired on October 15, 1991, and the partnerships were unable to supply the requisite security. Maryland National declared a default on the loan agreements, triggering the option to proceed directly against MBL under the guarantees and/or foreclosure on the various properties. Maryland National has indicated it intends to initiate foreclosure proceedings.

Thus under all three transactions, the filing of the rehabilitation proceeding and issuance of the rehabilitation orders constituted technical defaults on loan agreements aggregating $83,-

490,000 [2] and for which MBL is financially responsible through its unconditional guarantees. Appellants argue, however, the trial judge lacked *in personam* jurisdiction over them and, further, argue there exists no statutory basis for the restraints against foreclosure on the properties because the properties are not MBL assets. We consider these contentions within the context of the general background and purposes of the Uniform Insurers Liquidation Act (UILA), *N.J.S.A.* 17B:32–1 to 23.

The UILA was adopted by the National Conference of Commissioners on Uniform State Laws (Commissioners) and the American Bar Association in 1939, and was prompted by difficulties incurred in the liquidation and reorganization of insurance companies with assets and liabilities located in several states. *See* Prefatory Note to the Uniform Insurers Liquidation Act, 13 *U.L.A.* 322 (1986 & Supp.1991). The stated purpose of the Uniform Act was to eliminate some of these difficulties by providing a uniform act with reciprocal provisions that could be adopted by each state. *Id.* at 323. The Commissioners targeted six areas sought to be addressed by the Uniform Act. They highlighted the lack of authority which domiciliary receivers had over out-of-state assets—a situation which could lead to dissipation of assets unless ancillary receivers were appointed in non-domicile states. *Id.* at 322. Similarly, they noted that "inequity often results from the fact that creditors in non-domiciliary states may, if they are sufficiently well-informed and diligent, obtain preferences for themselves by commencing attachment or similar proceedings against such property as may be found in their respective states. Such proceedings can easily be commenced by properly informed creditors before ancillary proceedings are started, and as a result other less well-informed creditors suffer accordingly. *There is no just reason for permitting such preferences to prevail.*" *Id.* at 323 (emphasis added). *See Matter of Integri-*

---

[2]The Commissioner asserts that MBL's potential liability under its guarantees on all of the projects totals $550 million.

*ty Ins. Co.*, 240 *N.J.Super.* 480, 489, 573 *A.*2d 928 (App.Div. 1990).

The "six central remedies" of the Uniform Act have been characterized as: (1) the designation of the insurance commissioner of the domicile state as the receiver for an insurer; (2) authority for domiciliary receivers to proceed in non-domiciliary states; (3) vesting of title to assets in the domiciliary receiver; (4) provision for non-domiciliary creditors to have the option to proceed with claims before local ancillary receivers; (5) uniform application of the laws of the domiciliary state to the allowance of preferences among claims; and (6) prevention of preferences for diligent non-domiciliary creditors with advance information. *See Twin City Bank v. Mutual Fire Marine & Inland Ins. Co.*, 646 *F.Supp.* 1139, 1141 (S.D.N.Y.1986), *aff'd*, 812 *F.*2d 713 (2nd Cir.1987). *See also* Uniform Insurers Liquidation Act, Prefatory Note.

The purpose, thus, of the UILA is to provide for a uniform, orderly and equitable method of making and processing claims against financially troubled insurers and to provide for fair procedures for rehabilitating the business of such insurers and, if necessary, distributing their assets. *Ballesteros v. New Jersey Property Liab. Ins. Guar. Ass'n*, 530 *F.Supp.* 1367, 1370 (D.N.J.), *aff'd*, 696 *F.*2d 980 (3rd Cir.1982); *Superintendent of Ins. v. International Equip. Leasing, Inc.*, 247 *N.J.Super.* 119, 121, 588 *A.*2d 883 (App.Div.), *certif. denied*, 126 *N.J.* 389, 599 *A.*2d 165 (1991). *See also Matter of Integrity Ins. Co.*, 240 *N.J.Super.* at 489, 573 *A.*2d 928. The UILA also recognizes the benefits of centralizing the management of delinquency proceedings in the courts of one state. *Ballesteros v. New Jersey Property Liab. Ins. Guar. Ass'n*, 530 *F.Supp.* at 1371; *Superintendent of Ins. v. International Equip. Leasing, Inc.*, 247 *N.J.Super.* at 124, 588 *A.*2d 883. *See Murphy v. Ambassador Ins. Co.*, 195 *N.J.Super.* 274, 478 *A.*2d 1243 (Ch.Div.1984) (New Jersey ancillary receiver's possession of Vermont corporation's New Jersey assets subject to Vermont domiciliary receiver's jurisdiction). Consistent with these purposes, § 2 of the

Uniform Act and, pertinent hereto, *N.J.S.A.* 17B:32–15b (*see also N.J.S.A.* 17:30C–15b applicable to insurance companies other than life and health insurance companies), expressly empower a domiciliary receiver to receive title to all property wherever located in order to vest title and control over an insurer's business in the commissioner in the domicile state, and to prevent creditors in non-domicile states from gaining unfair preferences by securing attachments of the insurer's property in the foreign state. 13 *U.L.A.* at 322–323. *See also Murphy v. Ambassador Ins. Co.,* 195 *N.J.Super.* at 281, 478 *A.*2d 1243.

Maryland, like New Jersey, has enacted the UILA. *Md.Ann. Code,* Art. 48A, §§ 132, 132A, 145 to 148, 150 to 152 (1991 & Supp.1991). While South Carolina and Tennessee are not UILA states, they are "reciprocal" states by adoption of the Insurers Supervision, Rehabilitation and Liquidation Model Act (1989) (Model Act). The Tennessee and South Carolina laws have substantially comparable provisions requiring the commissioner of insurance to be the domiciliary receiver of a domestic insurer undergoing liquidation or rehabilitation, and also providing for the appointment of ancillary receivers. *See S.C.Code Ann.* §§ 38–27–910 and 38–27–320 (Law.Co-op.1989 & Supp.1991) and *Tenn.Code Ann.* §§ 56–9–302 and 56–9–404 (1980 & Supp.1991). Similar to the purpose of the UILA, one of the stated purposes of the Model Act is "[l]essening the problems of interstate rehabilitation and liquidation by facilitating cooperation between states in the liquidation process and by extending the scope of personal jurisdiction over debtors of the insurer outside this State." *S.C.Code Ann.* § 38–27–30; *Tenn.Code Ann.* § 56–9–101.

*a.*

New Jersey permits the exercise of long-arm jurisdiction over non-residents to the outermost limits allowed by the due process clause of the United States Constitution. *Avdel Corp. v. Mecure,* 58 *N.J.* 264, 268, 277 *A.*2d 207 (1971). Those limits differ depending upon whether general jurisdiction over a non-

resident or specific jurisdiction is sought. Where, as here, a suit arises out of, or is related to the non-resident's contacts with the forum, specific jurisdiction will exist if there are sufficient minimum contacts with the forum. *See Lebel v. Everglades Marina, Inc.,* 115 *N.J.* 317, 323, 558 *A.*2d 1252 (1989).

█   In the context of specific jurisdiction, the inquiry as to minimum contacts requires an analysis of "the relationship among the [non-resident], the forum, and the litigation." *Shaffer v. Heitner,* 433 *U.S.* 186, 204, 97 *S.Ct.* 2569, 2580, 53 *L.Ed.2d* 683, 698 (1977). Minimum contacts exist if they resulted from the non-resident's purposeful conduct and not the unilateral activities of the plaintiff. *World–Wide Volkswagen Corp. v. Woodson,* 444 *U.S.* 286, 297–98, 100 *S.Ct.* 559, 567–68, 62 *L.Ed.*2d 490, 501–02 (1980). As our Supreme Court noted in *Lebel v. Everglades Marina, Inc.,* 115 *N.J.* at 323–24, 558 *A.*2d 1252:

> "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz,* 471 *U.S.* 462, 475, 105 *S.Ct.* 2174, 2183, 85 *L.Ed.*2d 528, 542 (1985).... The question is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen, supra,* 444 *U.S.* at 297, 100 *S.Ct.* at 567, 62 *L.Ed.*2d at 501. Of course, the mere foreseeability of an event in another state is "not a 'sufficient benchmark' for exercising personal jurisdiction." *Burger King, supra,* 471 *U.S.* at 474, 105 *S.Ct.* at 2183, 85 *L.Ed.*2d at 542 (quoting *World–Wide Volkswagen, supra,* 444 *U.S.* at 295, 100 *S.Ct.* at 566, 62 *L.Ed.*2d at 500). Thus, we must determine whether [a non-resident] purposely created contacts with New Jersey.

█   In determining whether a non-resident has "purposely created contacts" with a state, courts have considered as a factor the entry by a non-resident into a contract with a party in the forum state. While such a contract will not automatically establish sufficient minimum contacts with the forum state, it will be examined in the context of the overall business transactions related to and surrounding the contract and the parties' relationship. *Burger King,* 471 *U.S.* at 479–480, 105

*S.Ct.* at 2185–2186, 85 *L.Ed.*2d at 545. Thus, in *Burger King,* the Court held that a Michigan Burger King franchisee could be sued in Florida, the domicile of the Burger King Corporation, even though he had no physical ties to Florida. The Court reasoned that the suit arose out of a contract which had a substantial connection with Florida because it contained a Florida choice-of-law provision. It also required franchise payments to be sent to Florida, and contemplated continuing and minute supervision of the franchise from Florida headquarters. *See also Lebel v. Everglades Marina, Inc.,* 115 *N.J.* at 317, 558 *A.*2d 1252 (sufficient contacts found premised upon contract to purchase a luxury boat with some telephone and mail contacts); *Cruz v. Robinson Eng'g Corp.,* 253 *N.J.Super.* 66, 600 *A.*2d 1238 (App.Div.1992) (sufficient contacts arising from contract by foreign manufacturer for equipment the manufacturer knew was to be shipped to New Jersey and was to be the *"sine qua non "* of the purchaser's New Jersey plant).

Once minimum contacts have been established, it is necessary to determine whether asserting jurisdiction over the non-resident would offend traditional notions of fair play and substantial justice. *Lebel v. Everglades Marina, Inc.,* 115 *N.J.* at 328, 558 *A.*2d 1252. In this respect, a non-resident whose activities establish minimum contacts must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 *U.S.* at 477, 105 *S.Ct.* at 2184–85, 85 *L.Ed.*2d at 544. Under this prong of the due process test, a variety of factors may be considered such as the burden on the non-resident, the forum state's interest in adjudicating the dispute, the resident's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *World–Wide Volkswagen Corp.,* 444 *U.S.* at 292, 100 *S.Ct.* at 564, 62 *L.Ed.*2d at 498.

■ Both of these tests are satisfied here. As successor trustees under bond indentures, the proceeds of which were used to finance the out-of-state real estate projects, appellants have a direct contractual relationship with MBL. In each instance, central to the issuance of the bonds and the underlying loan agreement with the developers, is MBL's contractual guaranty for the loan indebtedness. Negotiated for the benefit of the trustees and bondholders, each guaranty was integral to marketing of the bonds. Reflecting awareness of the involvement of New Jersey, the guarantees specifically acknowledge MBL is regulated in New Jersey, that its activities require compliance with New Jersey law, and critically, that New Jersey substantive law is to apply. Appellant's predecessors, then, entered into a contract with a New Jersey business that has a significant and acknowledged relationship with New Jersey regulatory authority. That the regulatory authority was deemed an essential element of MBL's viability in the transaction is evidenced by the fact the New Jersey rehabilitation order obtained by the Commissioner triggered defaults under the loan agreements and the threatened exercise of the guarantees.

This substantial involvement through the guarantees, thus, plainly placed the trustees and their successors on notice that they could be "haled into court" in the insurer's domicile state in the event of a delinquency proceeding against MBL. Any doubt of this must be dissipated by specific provision in the guarantees acknowledging that the validity and enforceability thereof could be limited by the bankruptcy, insolvency, and other laws relating to creditors' rights. Under their similar statutes, appellants must have recognized the potential limitation that might be imposed on full exercise of their rights under the guarantees and loan agreements in the event defaults triggered by the rehabilitation proceeding were to occur. Indeed, the UILA provisions specifically require that claims be

submitted to the domiciliary receiver unless ancillary receivers are appointed in foreign states. *N.J.S.A.* 17B:32–18.[3]

Appellants have presented no compelling reason to indicate jurisdiction in New Jersey would be unreasonable. Plainly New Jersey as the domicile state has an overriding interest in assuring that rehabilitation, if possible, is effectuated. Given Maryland's adoption of the Uniform Act and Tennessee and South Carolina's adoption of the similar Model Act, a single, cohesive, uniform handling of the rehabilitation through a single state is fully consistent with the underlying policies sought to be served by those laws. *Superintendent of Ins. v. International Equip. Leasing, Inc.*, 247 *N.J.Super.* at 124–25, 588 *A.*2d 883; *Murphy v. Ambassador Ins. Co.*, 195 *N.J.Super.* at 281–82, 478 *A.*2d 1243. Moreover, the interests of the trustees and bondholders, interests that could be considered paramount to the foreign states, are protected through the existence of individual applications that can be made to the Commissioner seeking relief from the restraints. The restraints also would permit ancillary proceedings in the foreign states. *See N.J.S.A.* 17B:32–18. And while being required to travel to New Jersey for court appearances might impose some inconveniences upon appellants, such inconvenience does not offend notions of fundamental fairness for greater inconvenience to all parties would result were multiple foreclosure proceedings in several different states to occur.

We thus conclude *in personam* jurisdiction exists over appellants sufficient to support a basis for the restraints against them precluding their commencement of foreclosure actions

---

[3]We recognize that a receiver has been appointed in Tennessee. We note, however, the overall cooperative scheme of the UILA and Model Act pursuant to which the Tennessee receiver would be considered an ancillary receiver. In this respect, the December 12, 1991 supplemental order, consistent with the UILA and Model Act, provides for proceedings to be brought before an ancillary receiver. Under these circumstances we reject Tennessee's contention that the appointment of receiver in that state precludes the exercise of jurisdiction here.

except as may be permitted consistent with the December 12, 1991 orders.

*b.*

In order to effectuate the policies and purposes sought to be achieved by the Uniform Act, the UILA reposes broad powers in the Commissioner and the trial court. The Commissioner is authorized to institute in the Superior Court a "delinquency proceeding" to rehabilitate, liquidate, conserve or reorganize an insurer. *N.J.S.A.* 17B:32-2 through *N.J.S.A.* 17B:32-4. Constituting the sole and exclusive method for accomplishing rehabilitation of an insurer, *N.J.S.A.* 17B:32-3, such rehabilitation may be initiated for a variety of reasons including, as in this case, the consent of the insurer. *N.J.S.A.* 17B:32-6k.

Upon application of the Commissioner for rehabilitation, the trial judge is empowered to issue orders restraining the insurer's officers and any other persons from transacting the business of the insurer or from wasting or disposing of its assets. *N.J.S.A.* 17B:32-4 and 5. The court may also issue "such other injunctions or orders" deemed necessary "to prevent interference with the commissioner or the proceeding, or waste of the assets of the insurer, or the commencement or prosecution of any actions, or the obtaining of preferences, judgments, attachments or other liens, or the making of any levy against the insurer or against its assets or any part thereof." *N.J.S.A.* 17B:32-5b.

Appellants argue that the trial court's order cannot prevent foreclosure actions or any other type of suit against the properties of the partnerships because they are not assets of MBL. In this respect, they contend that from the perspective of partnership law, a partner does not have an interest in specific partnership property, but only an interest in the partnership.

We consider it unnecessary to address the difficult issue of whether the partnership properties are MBL assets, for we view the statutory power of the Commissioner and the

corresponding injunctive authority of the trial court not to be so limited. In this respect, we repeat the often stated principles that construction of any statute necessarily begins with consideration of its plain language. *Merin v. Maglaki*, 126 *N.J.* 430, 434, 599 *A.*2d 1256 (1992); *Kimmelman v. Henkels & McCoy, Inc.*, 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987); *Renz v. Penn Central Corp.*, 87 *N.J.* 437, 440, 435 *A.*2d 540 (1981). Such language should be given its ordinary meaning, absent a legislative intent to the contrary. *Town of Morristown v. Woman's Club*, 124 *N.J.* 605, 610, 592 *A.*2d 216 (1991); *Mortimer v. Board of Review*, 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985); *Levin v. Township of Parsippany–Troy Hills*, 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). The primary task for the Court is to "effectuate the legislative intent in light of the language used and the objects sought to be achieved," *State v. Maguire*, 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980), and to construe a statute in a fashion consistent with the statutory context in which it appears, *Waterfront Comm'n v. Mercedes–Benz*, 99 *N.J.* 402, 414, 493 *A.*2d 504 (1985); *Airwork Serv. Div., etc. v. Director, Div. of Tax.*, 97 *N.J.* 290, 296, 478 *A.*2d 729 (1984), *cert. denied*, 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985). Moreover, a grant of power is always accompanied by implied authority that is fairly and reasonably necessary for the effective exercise of that power. *E.g. Juzek v. Hackensack Water Co.*, 48 *N.J.* 302, 314–15, 225 *A.*2d 335 (1966). And, perhaps critically here, the probable intent of the Legislature may be considered in determining the existence of implied authority where at the time of enactment a specific situation may not have been contemplated. *Amerada Hess Corp. v. Director, Div. of Tax.*, 107 *N.J.* 307, 318–19, 526 *A.*2d 1029 (1987), *aff'd*, 490 *U.S.* 66, 109 *S.Ct.* 1617, 104 *L.Ed.*2d 58 (1989). "Such an interpretation will not 'turn on literalisms, technisms or the so-called rules of interpretation; [rather] it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation.'" *AMN, Inc. v. South Brunswick Tp. Rent Leveling Bd.*, 93 *N.J.* 518, 525, 461 *A.*2d 1138 (1983) (quoting from *Jersey City Chapter,*

*Property Owner's Protective Ass'n v. City Council*, 55 *N.J.* 86, 100, 259 *A.*2d 698 (1969)). Finally, we are guided by the principle that interpretation of the powers conferred under the UILA should provide the broadest protection to the public, claimants and beneficiaries, as may be consistent with the Act's purposes. *Matter of Integrity Ins. Co.*, 240 *N.J.Super.* at 491, 573 *A.*2d 928.

The purposes of the Uniform Act and of our own statute clearly require that broad and expansive powers be granted the Commissioner and the trial court. Indeed, the plain language of the Act so provides. Upon the initial application for an order, for instance, the trial court is authorized to issue, without notice, a restraining order not only against the insurers, officers, directors, stockholders, policyholders and agents, but against "all other persons" from "the transaction of its business or the waste or disposition of its property...." *N.J.S.A.* 17B:32–5(a). More broadly, *N.J.S.A.* 17B:32–5(b) empowers the court to issue injunctions "to prevent interference with the commissioner" or to prevent "the commencement or prosecution of any actions," or "the obtaining of preferences, judgments, attachments or other liens," or "the making of any levy against the insurer" or "against its assets or any part thereof." These powers are expansive and, we think, provide ample authority for the injunctive relief issued here.

Even assuming the housing projects involved here are not, technically, direct assets of MBL—they are partnership assets in which MBL has a direct interest and further, because of the guarantees, foreclosure thereon would trigger deficiency judgments directly against MBL. Moreover, it is fairly evident that the investment in the properties are a substantial part of MBL's business, both through MBL's involvement in the partnerships which own the properties and through its separate unconditional guarantees. What actions appellants take affecting the properties directly concerns and impinges upon a substantial part of MBL's business.

Given these circumstances and in light of the legislative objective of ensuring an effective and efficient process by which rehabilitation, if possible, may be obtained, and the objective of uniform treatment of an insurer's business located both in the domiciliary state as well as the ancillary state, we have no hesitancy in construing the statutory injunctive powers to encompass the trial judge's orders here. And, though it might be suggested that the Legislature never contemplated life insurance companies would so heavily involve themselves in real estate through the use of separate corporate/partnership structures, had the Legislature so contemplated, we think it more than probable that the term "assets" would have been broadly defined so as to pierce the corporate/partnership structures and repose directly in the Commissioner and trial judge authority over such real estate wherever situated, particularly when those "assets" may be the very business of the insurance company that might have brought it to rehabilitation.

Drawing upon bankruptcy law applicable to the automatic stay provisions of 11 *U.S.C.* § 362, *cf. Sheeran v. Sitren*, 168 *N.J.Super.* 402, 411, 403 *A.2d* 53 (Law Div.1979), appellants argue the injunctive relief here went beyond that authorized by statute. We have recently recognized that the automatic stay provisions of the bankruptcy code ordinarily apply only to the debtor and its property and do not protect a corporation owned by or in which the debtor has an interest. *See Citizens First Nat'l Bank v. Marcus*, 253 *N.J.Super.* 1, 3–6, 600 *A.2d* 943 (App.Div.1991) and cases cited therein. But as we there noted an exception to that general proposition exists for "unusual circumstances." *Id.* at 7, 600 *A.2d* 943. *See A.H. Robins Co., Inc. v. Piccinin*, 788 *F.*2d 994, 999 (4th Cir.), *cert. denied*, 479 *U.S.* 876, 107 *S.Ct.* 251, 93 *L.Ed.*2d 177 (1986).

As described in *A.H. Robins*, such unusual circumstances arise "when there is no such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against

the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Id.,* 788 *F.*2d at 999. *Cf. Green v. Champion Ins. Co.,* 577 *So.*2d 249, 256–257 (La.App.), *writ denied,* 580 *So.*2d 668 (La.1991) (group of financial and insurance companies with common officers and unified administrative control constituted, along with insurer undergoing liquidation, a single business enterprise, thereby allowing the liquidator to assume control over all assets of the entities). *See also In re Imperial "400" Nat'l, Inc.,* 429 *F.*2d 671, 677–678 (3rd Cir.1970) (New Jersey had jurisdiction over the bankruptcy reorganization of both a corporate debtor, the sole business of which was real estate construction through partnerships throughout the country, and a Michigan real estate partnership in which the corporation had a 75% interest and which was considered part of a single business entity); *Matter of Colonial Realty Co.,* 122 *B.R.* 1, 2–4 (Bankr.D.Conn.1990) (where debtor, a general partnership, had management contract with limited partnership in which debtor's general partners had an interest, foreclosure action against real estate owned by limited partnership was subject to stay).

Here, appellants have not denied that foreclosures against the properties of the partnerships in all probability will result in deficiency judgments directly against MBL under its guarantees. The interrelationship between MBL, Muben, and the properties coupled with MBL's relationship with the trustees through its guarantees, create, we think, an "identity of interest" between MBL and the properties such that a judgment against the partnerships would be a judgment against it. Thus the "unusual circumstances" exception set forth in *A.H. Robins* would apply.

But beyond this, injunctive relief under the bankruptcy code is also available pursuant to 11 *U.S.C.A.* § 105 which authorizes the bankruptcy court to issue any order, process or judgment necessary to carry out the provisions of Title 11. It

allows a court to stay actions not covered by the automatic stay.  As discussed in *A.H. Robins,* such applications, requiring the weighing of competing interests, may issue to protect the integrity of the debtor's estate and the court's custody thereof and to preserve the court's ability to accomplish reorganization. *A.H. Robins, supra,* 788 *F.*2d at 1003.  In *In re Cardinal Industries,* 109 *B.R.* 748, 752–754 (Bankr.S.D.Ohio 1989), for example, the bankruptcy court granted a debtor corporation's request for a stay against the foreclosure of real estate owned by a limited partnership in which it had an interest.  The debtor's argument that the foreclosure actions were automatically stayed was rejected.  But the court agreed that allowing the actions to proceed with respect to some of the properties would have a negative affect upon the reorganization and, therefore, a stay was appropriate because the debtor had demonstrated the likelihood of its submitting a successful plan for reorganization as well as the fact that stay would save it from irreparable injury.  *Id.* at 752–754.

Similarly, here, we think there is a significant likelihood the proliferation of foreclosure suits across the country, with their potential for deficiency judgments, would impair the potential for rehabilitation by creating liabilities which would not exist if the suits were enjoined during the pendency of the delinquency proceeding.  This potential for multi-state foreclosures during the attempt to rehabilitate MBL can only adversely affect its chances for rehabilitation.  Appellants have not suggested such rehabilitation is not a possibility.  Indeed, we have been told a reorganization plan is to be filed with the trial judge shortly. On the other hand staying such foreclosures would not adversely affect the trustees or their bondholders, for not only is the debt service of each property current, but the December 12, 1991 orders contain a provision that allows a trustee to apply to the Commissioner for leave to pursue a foreclosure action as well as applying for ancillary receivers in the foreign states. Finally, consideration of MBL policyholders must be accorded some weight.  Unlike the bondholders who took some risk when

they invested in the real estate projects, MBL's policyholders took no conscious risk when they purchased life insurance policies. They will sustain irreparable harm if MBL is not successfully rehabilitated and, unlike the bondholders, would have no MBL guaranty to fall back on. Thus, although we find it unnecessary to resort to bankruptcy law, we think if it were necessary to do so, that law would fully support the injunctive relief here.

*c.*

We thus reject appellants' claim the trial judge lacked *in personam* jurisdiction over them and exceeded the scope of his authority under the act in enjoining foreign foreclosures. We have considered the remainder of appellants' arguments and find them to be clearly without merit. *R.* 2:11–3(e)(1)(E).

Affirmed.