253 N.J. Super. 66 (1992)
600 A.2d 1238
ERASMO CRUZ AND JOSEFA CRUZ, PLAINTIFFS-APPELLANTS,
v.
ROBINSON ENGINEERING CORP., JOHN DOE AND J.D. CORP., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 10, 1991.
Decided January 10, 1992.
*67 Before Judges PRESSLER, SHEBELL and SKILLMAN.
Stephen J. Cochi argued the cause for appellants.
*68 David W. Lentz argued the cause for respondents (Nagel & Rice, attorneys).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is a long-arm jurisdiction case. Plaintiff Erasmo Cruz, whose wife Josefa Cruz sues per quod, sustained a serious injury of his left hand while operating a heavy-duty urn filter press on the New Jersey industrial premises of his employer, Altra Filters, Inc. (Altra). Claiming that the press was defective by reason of its lack of safety features, he brought this products liability action against its designer and manufacturer, defendant Robinson Engineering Corporation (Robinson), a corporation of the State of California. Plaintiff effected service pursuant to R. 4:4-4(c). The trial court granted Robinson's motion for dismissal under R. 4:6-2(b), concluding that Robinson's contacts with the State of New Jersey were insufficient to justify a long-arm assertion of jurisdiction over it. Plaintiff appeals. We reverse.
Our review of the record satisfies us that there are adequate undisputed facts to warrant New Jersey's exercise of long-arm jurisdiction here. Altra, a corporation of the State of California, is in the business of manufacturing coffee filters, including filters for large commercial-size urns. The urn filter press fabricated by Robinson, a machine of great bulk weighing between two and a half and three tons and sold to Altra for $75,000, is the basic equipment of Altra's urn filter manufacturing process. It appears from the record that prior to 1985 Altra, to Robinson's knowledge, operated an urn filter manufacturing plant in California. Sometime in 1985, Altra decided to engage in that industrial activity in New Jersey. It ordered the design and fabrication of the urn filter press from Robinson in California in November 1985, assuming that the scheduled twenty-week fabrication time would enable it to implement its commitment to undertake a lease of New Jersey premises in *69 the spring of 1986 and to open the New Jersey manufacturing facility on or about May 1, 1986.
The press was not completed within the originally agreed upon time frame or, indeed, within the next several months thereafter. On July 22, 1986, Altra wrote to Robinson detailing the history of the transaction between them and proposing a detailed set of terms and conditions upon which Altra conditioned its willingness to continue with the contractual undertaking despite Robinson's breach. The letter was countersigned by Robinson, which did not apparently dispute Altra's statement that:
On various occasions during the past eight months we periodically checked with you with reference to the status of the overall progress of the design and fabrication. Your reply was consistently positive and you repeatedly indicated to us that you were "on schedule." Further, prior to executing our building lease in New Jersey, Ron and myself met with you and stressed the importance of verifying a firm delivery commitment from you, because of the amount of lease money that was to be involved. The point being, as we conveyed to you, that there was no purpose in committing to the building, without a very positive and accurate delivery date for the machine. You will recall that you once again indicated that everything was "on schedule." We subsequently occupied the space, based on your continued commitment and optimism.
Based on the terms of the original agreement, as referred above, the machine was to have been completed on approximately the third week of April, 1986. Allowing for some contingency, we scheduled our activities to receive the unit on May 1, 1986.
The urn filter press, only one of two ever manufactured by Robinson, was ultimately completed and delivered to Altra, f.o.b. Robinson's California plant, and then shipped by Altra's common carrier to its New Jersey plant. Altra had made most of the payments by checks drawn on its New Jersey bank account which bore on their face both Altra's California and New Jersey addresses, and the January 1987 invoice submitted by Robinson noted that the machine had been shipped to New Jersey on January 6, 1987.
The record also demonstrates that this transaction and Robinson's fabrication for Altra's New Jersey plant of a smaller filter press, simultaneously invoiced, constituted Robinson's sole contacts with New Jersey. It owns no property here, maintains no *70 assets here, maintains no business premises here, and is not otherwise present.
Based on the foregoing facts, the trial judge was of the view that the only basis for long-arm jurisdiction over Robinson in New Jersey was the so-called stream of commerce theory sanctioned by the United States Supreme Court in Worldwide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and accepted by the New Jersey Supreme Court in Charles Gendler & Co., Inc. v. Telecom Equipment Corp., 102 N.J. 460, 508 A.2d 1127 (1986). The trial judge, however, read the more recent statement of the New Jersey Supreme Court in Lebel v. Everglades Marina, Inc., 115 N.J. 317, 558 A.2d 1252 (1989), as rejecting stream of commerce and returning to a traditional minimum contacts basis for asserting extra-territorial jurisdiction. Finding insufficient contacts, he dismissed the action for lack of in personam jurisdiction.
We need not retread the ground so recently explored by the New Jersey Supreme Court in Lebel. We do, however, note that the jurisdictional analysis of Lebel was based in large measure on the United States Supreme Court's consideration of long-arm jurisdiction in Asahi Metal Industry Co., Ltd v. Superior Court, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). The transactional and relational facts in Asahi are critical to an understanding of the Supreme Court's disposition.
Underlying the controversy in Asahi was a motorcycle accident which occurred in California and which the injured motorcyclist alleged to have been caused by a defective tire. In California he sued, among others, Cheng Shin Rubber Industrial Co., Ltd, the Taiwanese company which had manufactured the tire. Cheng Shin sought indemnification from Asahi, a Japanese company which had manufactured the valve assembly used by Cheng Shin in fabricating the tire tube. Ultimately, the plaintiff-motorcyclist's claims against all defendants were settled, leaving only Cheng Shin's indemnification complaint against Asahi remaining for adjudication in the California *71 court. All nine Justices agreed that under these facts, California's exercise of jurisdiction over Asahi for the sole purpose of adjudicating Cheng Shin's indemnification claim would offend the traditional notions of fair play and substantial justice which underlay the minimum contacts thesis of International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Thus, the majority of the Court concurred with Justice O'Connor's predicate rationale that beyond the nature and extent of the contact itself:
... the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." [citations omitted] [480 U.S. at 113, 107 S.Ct. at 1033]
And the entire Court concurred that in view of the minimality of Asahi's contacts, a consideration of the remaining factors dictated against California's exercise of jurisdiction. Thus, the right to judicial relief of California's citizens and the safety of its consumers generally were not involved, the controversy was between two foreign corporations respecting an indemnity agreement made between them in a foreign country, the choice of law question respecting interpretation of the indemnity agreement was in substantial doubt, and the extremely heavy litigative burden on Asahi did not confer any offsetting benefit to the legitimate interests of California.
The Court's unanimity in Asahi as to the fundamental unfairness of the exercise of long-arm jurisdiction on the facts before it minimizes, to a degree, the significance of its disagreement on the question of whether, when the policy considerations militate towards an exercise of jurisdiction, stream of commerce contact will constitute by itself a sufficient basis therefor. Four justices concluded it would not, four concluded that it would, and one, Justice Stevens, declined to reach the issue, noting, however, his concern that in any event Asahi's contacts *72 with California had transcended mere stream of commerce. 480 U.S. at 122, 107 S.Ct. at 1037.
Justice Stevens separate concurring opinion is helpful in focusing the distinction between a traditional minimal contacts theory and stream of commerce theory. In short, the conceptual basis of stream of commerce jurisdiction is simply that one who puts products into the stream of commerce knowing that they are liable to wind up anywhere or even somewhere in particular on an essentially random or fortuitous basis is legally responsible for those products in whatever jurisdiction they have caused legal harm. The conceptual basis of the more traditional minimum contacts theory is the purposeful availment by one outside the jurisdiction of the resources of the forum jurisdiction or the taking of an action by him "purposefully directed toward the forum State." 480 U.S. at 112, 122, 107 S.Ct. at 1032, 1037.
We consider Lebel in the light of this jurisprudential background. As we read Lebel, it does not reject either Volkswagen or Charles Gendler. What it says is merely that since the viability of stream of commerce as the exclusive jurisdictional justification has been "unsettled" by Asahi, that jurisdictional theory ought not constitute the ratio decidendi if jurisdiction can be sustained on traditional minimum contacts analysis. 115 N.J. at 319-20, 558 A.2d 1252. We follow the lead of Lebel in this respect since we are persuaded that such an analysis impels the conclusion of assertable jurisdiction here as well.
We start with the proposition, articulated in detail by Lebel, that the weight of the contacts which will sustain jurisdiction depends on whether the subject of the litigation arises out of defendant's contacts with the forum jurisdiction, that is, specific jurisdiction, or whether the contacts are relied on by plaintiff to subject defendant to unrelated claims in the forum jurisdiction, that is, general jurisdiction. While sustained, systematic and continuous contacts are required for the exercise of general jurisdiction, lesser contacts are required to sustain the *73 exercise of specific jurisdiction. As to such assertions, as Lebel holds, "[t]he `minimum contacts' requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." 115 N.J. at 323, 558 A.2d 1252.
We have no doubt that Robinson's contact vis-a-vis New Jersey meets the "purposeful conduct" test necessary to sustain an exercise of specific jurisdiction. It was not the producer of an assembly line product of wide distribution which might find its way randomly or fortuitously or even foreseeably to New Jersey. The product here was a major industrial piece of equipment, the cornerstone of an entire industrial operation, custom-ordered, custom produced and taking over a year to fabricate. Robinson asserts by its affidavit in support of its dismissal motion that it was not aware when it first took Altra's order for the urn filter press that it was to be used in New Jersey. Even if that were so, and Altra's affidavits appear to dispute that assertion, Robinson certainly understood at the time it signed the letter agreement which excused its breach and which may be regarded as a substitutionary agreement, that the subject of the agreement was not only to be shipped to New Jersey but was, moreover, the sine qua non of Altra's New Jersey plant, the predicate of the whole New Jersey operation. And, according to that letter agreement, it had that knowledge during most, if not all, of the time period consumed in the fabrication.
Nor do we regard as significant the California delivery by Robinson to Altra. Whose carrier would actually transport this piece of machinery to New Jersey and which party would pay the freight are business matters, not, in the context of this case, jurisdictional ones. We think it clear, in any event, that a party otherwise subject to long-arm jurisdiction by reason of the substantive nature of his contacts cannot immunize himself from the exercise thereof by the simple and unilateral expedient of a f.o.b. arrangement.
*74 We note, moreover, that all other relevant factors balance in favor of New Jersey's exercise of jurisdiction over plaintiff's action. As a matter of its own policy, New Jersey has a considerable interest in providing a forum to those of its citizens who are employed here and sustain industrial accidents here. New Jersey law clearly applies to a products liability action involving machinery causing an industrial accident in this state. There is no unduly heavy burden imposed upon Robinson by being required to litigate here. The machinery is already here as are plaintiff and his employer, the buyer. To the extent that forum non conveniens issues overlap and intertwine with long-arm jurisdictional ones, all indications favor New Jersey litigation.
In sum, Robinson custom designed and manufactured a piece of major industrial equipment which made possible Altra's entire industrial activity in New Jersey and also subjected New Jersey workers to injury by reason of whatever defect may have inhered therein. It does not offend traditional notions of fundamental due process for it to be answerable in this forum to workers so injured. That consequence is the foreseeable, if not the inevitable, result of the degree to which it has purposefully directed and benefitted from its conduct here.
The order of dismissal is reversed and we remand for further proceedings.