945 A.2d 92 (2008)
399 N.J. Super. 539
Robert NICASTRO and Roseann Nicastro, h/w, Plaintiffs-Appellants
v.
McINTYRE MACHINERY AMERICA, LTD., J. McIntyre Machinery Ltd., Defendants-Respondents.
No. A-1755-06T5.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 2007.
Decided April 9, 2008.
*95 Alexander W. Ross, Jr., Marlton, argued the cause for appellants (Rakoski & Ross, P.C., attorneys; Mr. Ross and Janice L. Heinold, on the brief).
Steven F. Gooby, New York City, argued the cause for respondents (DLA Piper U.S. LLP, attorneys; Mr. Gooby, of counsel and on the brief; James S. Coons, on the brief, Edison).
Before Judges CUFF, LISA and SIMONELLI.
The opinion of the court was delivered by LISA, J.A.D.
The issue in this case is whether New Jersey courts can assert long-arm jurisdiction over the British manufacturer of an industrial machine, which plaintiff alleges was defectively designed and caused him to be injured in a workplace accident in New Jersey. Plaintiffs employer purchased the machine new from the manufacturer's exclusive United States distributor, an Ohio corporation, after the employer attended a national trade convention in Las Vegas, Nevada and learned about the machine at a booth exhibit jointly operated by the manufacturer and distributor. The manufacturer had no physical presence in New Jersey and asserted that it had no control over the activities of its United States distributor and had no knowledge of the domiciles of buyers to whom the distributor sold defendant's machines after defendant transferred title to the machines and shipped them to the distributor in Ohio. The trial court concluded that plaintiff failed to establish that defendant had sufficient minimum contacts with New Jersey to subject it to personal jurisdiction, and that even under the most liberal form of the stream-of-commerce theory, defendant would not be subject to personal jurisdiction in New Jersey.
We conclude that sufficient minimum contacts exist under the "stream-of-commerce plus" rationale espoused by Justice O'Connor in Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L. Ed.2d 92, 104 (1987). We further conclude that entertainment of jurisdiction in New Jersey would not offend traditional notions of fair play and substantial justice. Accordingly, we reverse the order dismissing the complaint against the manufacturer for lack of personal jurisdiction.
J. McIntyre Machinery, Ltd. (defendant), a British corporation based in Nottingham, England, is in the business of manufacturing shearing machines used in scrap metal recycling operations. McIntyre Machinery America, Ltd. (McIntyre America), an Ohio corporation with its principal place of business in Stow, Ohio, was defendant's exclusive distributor in the United States prior to going bankrupt in 2001. McIntyre America was not a subsidiary of defendant and there was no commonality of ownership or management of the two companies. They were independent corporate entities. There was apparently no written contract between the two companies, but the record reveals a close ongoing business relationship in which they cooperated in selling defendant's products to United States industrial customers.
*96 Plaintiff, Robert Nicastro, a New Jersey resident, was employed by Curcio Scrap Metal in Saddle Brook. On October 11, 2001, plaintiff's hand became lodged in a shearing machine he was operating, causing him severe injuries. The machine was a Model 640 Shear manufactured in 1995 by defendant in England. The machine is about eight feet long and six feet high and weighs more than three tons.
In 1994 or 1995, Frank Curcio, the owner of Curcio Scrap Metal, attended the Institute of Scrap Recycling Industries (ISRI) convention in Las Vegas, Nevada. He visited an exhibitor's booth jointly operated by defendant and McIntyre America and obtained information about the Model 640, with which he was not previously familiar. Curcio learned that the machine was manufactured by defendant in England and distributed throughout the United States by its sole United States distributor, McIntyre America. Based upon that contact, Curcio ordered the machine.
Defendant shipped the machine from England to McIntyre America in Ohio, which then shipped it to Curcio Scrap Metal in Saddle Brook. The purchase price was $24,900, as reflected in the August 25, 1995 invoice issued by McIntyre America to Curcio Scrap Metal. The invoice described McIntyre America as "America's Link to Quality Metal Processing Equipment."
The machine came with an instruction manual bearing on its cover defendant's name, with a sticker affixed containing McIntyre America's name. The manual advised that owners and operators must familiarize themselves and comply with specified safety standards issued in the United Kingdom and the United States, and set forth sources in both countries for applicable "working practices and regulations."
Defendant's president attended the ISRI conventions in Las Vegas in 1994 and 1995, which Frank Curcio attended. The president attended ISRI conventions each year from 1990 through 2002, held in various cities in the United States. Some years, he was accompanied by one or two other management level officers of defendant. Defendant's management level personnel also attended exhibitions, conferences and annual meetings of other United States trade organizations in the scrap metal industry.
Notwithstanding the apparent absence of a written contract, defendant does not dispute that McIntyre America was its sole United States distributor during the relevant time period. Evidence in the record illuminates to some extent the nature of the relationship between the two companies regarding the sale of defendant's machines in the United States.
Defendant did not own property, maintain an office or bank account, or have employees in New Jersey. It was not licensed to do business in New Jersey and had no registered agent here. Its former managing director, Sally Johnson, certified that defendant "does not directly market, sell or solicit the business of anyone in New Jersey to buy its products, nor did it ever do so. McIntyre does not, and never did, employ a sales staff in or for the United States." (emphasis added).
In a January 13, 1999 letter to McIntyre America, Johnson expressed concern over apparent disputes developing between the two companies and stated that she and "the Boss" would come to the United States to meet with McIntyre America's representatives within the next few days "to see how we can get things back on an even keel and move the businesses forwards [sic]." Johnson stated that defendant would arrange for collection of some *97 of its unsold machines and equipment (other than Model 640s), "which should help to get your storage costs down." She then stated:
I note also that you have 3 640s unsold which I understood to have been sent out against firm orders  otherwise we wouldn't have built them! Perhaps we should also look at bringing a couple of those back also. It is important for us to try to turn some of your stock into cash as quickly as possible, since it is presently costing us £20,000 per year to fund it. If we can get the stock levels down, then we could look again at machine costings and perhaps in the short term try to send out fewer machines but give you more margin on them.
In a November 23, 1999 communication from defendant's president to McIntyre America, it is evident that the difficulties between the two companies continued. He stated:
As you know, we are unhappy with the present situation. All we wish to do is sell our products in the States  and get paid! If this isn't possible then the only other option open to us is for us to split up in an amicable fashion as quickly as we can. I note that you still have new machines in stock, which you are presently unable to sell. Please note that those machines are our property until they have been paid for in full.
During the interim period, on April 23, 1999, McIntyre America communicated with Johnson, referencing "what we discussed at ISRI" regarding "commissions." Apparently, McIntyre America took a "commission" on a sale before defendant was "paid by the customer for it." McIntyre America assured defendant that "[w]e do not plan to collect our commissions in this fashion on an ongoing basis," but explained that it was in a tight cash flow position at that time. McIntyre America assured defendant:
We have no problem waiting for you to receive payment from the customer first before requesting our commission via a comp[an]y invoice in the future. It was not our intention to upset you or your books over in England with our actions. That's why I paid you for the 407 shear, that we just got payment for by check, even though it has not even had time to clear our bank! We have all worked very hard to build up confidence in each other and we have no desire to jeopardize those strides. I have faxed over an invoice for the commission today, and I will send you out a hard copy in the mail.
These communications support the reasonable inference that defendant retained a significant measure of control over the level of McIntyre America's inventory of defendant's machines, which remained defendant's property until McIntyre America sold them to United States customers. It is also reasonable to infer that defendant dictated the "margin" or "commission" McIntyre America would receive when a sale was accomplished. It is thus evident that the two companies were acting closely in concert with each other to sell defendant's machines to customers throughout the United States, through a distribution system in which McIntyre America was a conduit for the sales.
Although our minimum contacts analysis focuses on the timeframe leading up to the sale of the product, we consider subsequent conduct by defendant for the limited purpose of supporting reasonable inferences that relate back to its conduct at the critical time. In addition to that which we have already described regarding direct dealings between defendant and McIntyre America, other uncontroverted conduct and statements by defendant *98 demonstrate its continuing course of conduct with successors to McIntyre America, as defendant's exclusive distributors, and defendant's continuing activities directed at selling its products to United States customers through these exclusive distributors.
An article in a trade publication, Recycling Today, in May 2002, announced that defendant appointed Recycling Equipment Corp. (REC), of Pennsylvania, as its "exclusive North American distributor." The article described the first United States sale of a particular shear machine model to a Tennessee purchaser, and elaborated: "The machine was exhibited at the recent ISRI convention in Las Vegas, and was purchased from the J. McIntyre Machinery Ltd. booth." Information in the article was attributed to Sally Johnson. The article stated: "Although McIntyre shears are well established in America, this is the first shipment to the U.S. in more than 18 months, following the demise of J. McIntyre Machinery Ltd.'s former distributor, McIntyre America." Then, Johnson was quoted as saying, "We had a fantastic ISRI show with our new distributor REC. . . . We received strong inquiries, and it is actually some years since we sold a shear off the stand at an American exhibition."
REC was then replaced by Strip Technology, Inc. (Strip-Tec), of Texas, as defendant's exclusive United States distributor. In October 2003, this article appeared in Recycling Today:
Strip Technology Inc. (Strip-Tec), Fort Worth, Texas, has recently ordered its second container load of alligator shears manufactured by J. McIntyre Machinery Ltd., Dunkirk, U.K.
"Since having been appointed sole agents for the McIntyre shear range only six months ago, Strip-Tec has placed an order for its second container of equipment," a news release from the British equipment maker states.
Strip-Tec president Bobby Alexander says his company is carrying J. McIntyre shears in stock at the company's facility in Fort Worth while also holding a spare parts inventory to offer "excellent back-up support for the McIntyre shear range."
Sally Johnson, J. McIntyre's managing director, has also advised North American buyers to deal only with Strip-Tec for the purchase of new J. McIntyre shears.
"J. McIntyre Machinery is keen to stress that Strip-Tec is now the only company authorized to sell new McIntyre equipment following the demise of our former agent McIntyre America in 2001," says Johnson, referring to a former Ohio-based distributor.
Johnson has asked recyclers who learn of any North American companies offering new McIntyre shears other than Strip-Tec "or its appointed representatives" to contact Strip-Tec in the U.S. at (800) 426-4126 or J. McIntyre Machinery Ltd in the U.K. at &8F44 XXX-XXX-XXXX. "These machines may not have been authorized for sale by the manufacturer, and as such may be being sold illegally and without the latest operating instructions, warning labels and operator guarding," Johnson says of equipment offered in North America by someone other than Strip-Tec.
Johnson also says any McIntyre customers who purchased their machines from the prior distributor "are encouraged to register their equipment with Strip-Tec in order to receive information on latest equipment updates and allow McIntyre and Strip-Tec to offer full support and competitive pricing on genuine McIntyre spare parts."
*99 Curcio does not contend that it utilized the trade publication articles as sources of information for the machine it purchased. And, of course, we realize that the articles we have quoted did not involve McIntyre America, but its successors. Nevertheless, the evidence supports defendant's continuing outreach for United States sales of its machines and parts through its exclusive United States distributor and no one else. The articles specifically mention McIntyre America. It is reasonable to infer that the arrangements were similar during McIntyre America's tenure as defendant's exclusive United States distributor.
The trial court found that defendant "does not have a single contact with New Jersey short of the machine in question ending up in this state." The court deemed it critical that the manufacturer and distributor were "entirely separate business entit[ies]." Apparently accepting the statement in Johnson's certification that defendant "had no knowledge of the business dealings between [McIntyre America] and its customers, including Curcio, concerning the at-issue shear," the court found "no evidence here establishing that the defendant had any expectation that its product would be purchased and utilized in New Jersey." The court therefore concluded that no basis for personal jurisdiction was established, either under the traditional minimum contacts test or the stream-of-commerce theory.[1]
New Jersey's equivalent of a long-arm statute, Rule 4:4-4(b)(1), permits service of process on a non-resident defendant "consistent with due process of law." Accordingly, New Jersey courts have allowed out-of-state service to the outermost limits permitted by the United States Constitution. Avdel Corp. v. Mecure, 58 N.J. 264, 268, 277 A.2d 207 (1971).
Due process requires that a defendant who is not physically present have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940)). "Minimum contacts" is understood to require that a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). The purpose of the minimum contacts doctrine is to protect a defendant against litigating in an inconvenient forum and to ensure that states do not exceed their jurisdictional limits. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92, 100 S.Ct. 559, 564, 62 L.Ed.2d 490, 498 (1980). The doctrine has been relaxed substantially over the years because of the fundamental transformation in the American economy, commonly involving interstate business transactions without physical presence. Id. at 292-93, 100 S.Ct. at 565, 62 L.Ed.2d at 498.
The due process analysis requires consideration of whether the defendant should reasonably anticipate being haled into court in the forum state. Burger *100 King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985). It must be shown that the defendant has purposefully availed itself of the privilege of engaging in activities within the forum state, thus gaining the benefits and protections of its laws. Id. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542. The purposeful availment requirement protects defendants against being haled into court in a foreign jurisdiction solely on the basis of random, fortuitous, or attenuated contacts, or as a result of the unilateral activity of some other party. Ibid.
If a plaintiff succeeds in establishing sufficient minimum contacts, the court must also determine whether entertaining jurisdiction would be Consistent with considerations of fair play and substantial justice. Id. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543; Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322, 558 A.2d 1252 (1989).
More than fifty years ago, the United States Supreme Court recognized that the minimum contacts basis as an alternative to the requirement of physical presence for the assertion of in personam jurisdiction was justified by the "increasing nationalization of commerce," in which many business transactions were conducted across state lines, and the corresponding improvements in modern transportation and communication that made it less burdensome for a party sued to defend himself in a state where he engages in economic activity. McGee v. In'l Life Ins. Co., 355 U.S. 220, 222-23, 78 S.Ct. 199, 201, 2 L.Ed.2d 223, 226 (1957). In World-Wide Volkswagen, supra, the Court observed that these "historical developments . . . have only accelerated in the generation since [McGee] was decided." 444 U.S. at 293, 100 S.Ct. at 565, 62 L.Ed.2d at 498-99.
Another generation has now passed since World-Wide Volkswagen was decided in 1980, and "the acceleration in the internationalization of commerce is apparent." Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 615 (8th Cir.), cert. denied, 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994). With increased globalization of commerce, "it is only reasonable for companies that distribute allegedly defective products through regional distributors in this country to anticipate being haled into court by plaintiffs in their home states." Ibid. At the same time, however, a countervailing policy consideration cautions that particularly careful inquiry must be made into the reasonableness of the assertion of jurisdiction over an alien defendant, and courts should be unwilling to find the serious burdens on an alien defendant of having to litigate in a foreign country outweighed by only minimal interest on the part of a plaintiff or the forum state. Asahi, supra, 480 U.S. at 115, 107 S.Ct. at 1034, 94 L.Ed.2d at 106-07.
In the minimum-contacts analysis, courts distinguish between specific and general jurisdiction. Wilson v. Paradise Vill. Beach Resort & Spa, 395 N.J.Super. 520, 527, 929 A.2d 1122 (App.Div.2007). "Although the minimum-contacts test centers on the defendant's relationship with the forum state, the sufficiency of the contacts for jurisdictional purposes depends on `the relationship among the defendant, the forum, and the litigation * * *.'" Charles Gendler & Co., Inc. v. Telecom Equip. Corp., 102 N.J. 460, 471, 508 A.2d 1127 (1986) (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683, 698 (1977)). When the cause of action is unrelated to the defendant's contacts with the forum state, the court's jurisdiction is general, and continuous and substantial contacts are required. Id. at 471-72, 508 A.2d 1127. However, when the cause of action arises directly out of *101 the defendant's contact with the forum state, the court's jurisdiction is specific, and an isolated act by the defendant may be sufficient to support jurisdiction over that defendant. Id. at 471, 508 A.2d 1127. Jurisdiction is more likely to be found when the cause of action arises directly out of the defendant's contacts with the forum state. Ibid. Because plaintiffs cause of action arises directly out of the sale to a New Jersey purchaser for use in New Jersey of the shear machine that allegedly caused plaintiffs injury, this is a case of specific jurisdiction.
In World-Wide Volkswagen, supra, the United States Supreme Court adopted the stream-of-commerce theory as a basis for establishing minimum contacts, 444 U.S. at 297-98, 100 S.Ct. at 567, 62 L.Ed.2d at 501-02, and the Court reiterated its commitment to the theory in Burger King, supra, 471 U.S. at 473, 105 S.Ct. at 2182, 85 L. Ed.2d at 541. In 1986, in Charles Gendler, supra, the New Jersey Supreme Court adopted the stream-of-commerce theory, and explained it this way:
In World-Wide Volkswagen, the Supreme Court noted that the stream-of-commerce theory would apply to subject foreign manufacturers and major distributors, but not local retailers or distributors, to jurisdiction in the states where their products were eventually shipped and sold. The foreseeable market served by local retailers and distributors, which are at the end of the distribution chain, is constrained. In contrast, manufacturers and distributors, which are at the start of a distribution chain, serve a larger market and purposely conduct their activities to make their product available for purchase in as many forums as possible. For such a manufacturer, the sale of its product in a distant state is not simply an isolated event, but the result of the corporation's efforts to cultivate the largest possible market for its product. Because the manufacturer and primary distributor intend to serve and derive benefits from a larger market, it is fair to subject them to jurisdiction, while excusing a secondary distributor or retailer.
As observed in several cases, foreign manufacturers derive benefits from the indirect sale of their products throughout the United States. By increasing the distribution of its products, the manufacturer not only benefits economically from indirect sales to forum residents, but also benefits from the protection provided by the laws of the forum state. Thus, a manufacturer that distributes its products into the stream of commerce for widespread distribution derives both legal and economic benefits from the states in which its products are sold. In sum, the system through which the manufacturer distributes its products evidences the manufacturer's purposeful penetration of the market.
A foreign manufacturer that purposefully avails itself of those benefits should be subject to personal jurisdiction, even though its products are distributed by independent companies or by an independent, but wholly-owned, subsidiary. In today's complex business world, foreign manufacturers rarely deliver products directly to consumers in the United States. Instead, these manufacturers employ middlemen, many of whom are often independent, to act as their distribution arms. To allow a foreign manufacturer to shield itself from liability for damages caused by its products distributed by those middlemen would be to permit a legal technicality to subvert justice and economic reality in the worst sense. Foreign manufacturers should not be allowed to insulate themselves by using intermediaries in a chain of distribution *102 or by professing ignorance of the ultimate destination of their products. Thus, the stream-of-commerce theory supports personal jurisdiction over foreign manufacturers that derive benefits from the distribution and sale of their products in the United States.
As applied to a manufacturer, the stream-of-commerce theory supports the exercise of jurisdiction if the manufacturer knew or reasonably should have known of the distribution system through which its products were being sold in the forum state. The manufacturer's awareness of the distribution system satisfies the requirement that the manufacturer have a reasonable expectation that its products will be purchased in the forum state. It makes no difference whether the manufacturer had actual or constructive knowledge of the distribution system. A manufacturer that should have known, like one that actually knows, that its products will be sold in the forum state purposefully avails itself of the benefits of the forum's laws.
By definition, a stream-of-commerce case involves a sale not by the manufacturer, but by another entity in the chain of distribution. To be subject to the stream-of-commerce theory in some jurisdictions, the manufacturer must purposefully participate in or control the distribution of its products. We believe, however, that a manufacturer need not so control the distribution system to place its products into the stream of commerce and, therefore, control of that system is not necessary to subject the manufacturer to the jurisdiction of the forum state. The focus is on the manufacturer's actual or constructive awareness of the system, not on control of the distribution of its products. A manufacturer's establishment or control of a distribution system, of course, satisfies the requirement that the manufacturer was aware of that distribution system.
A manufacturer's awareness of the distribution system, through which it receives economic and legal benefits, justifies subjecting the manufacturer to the jurisdiction of every forum within its distributors' market area. Accordingly, a manufacturer that knows its products are distributed through a nationwide distribution system should reasonably expect that those products would be sold throughout the fifty states and that it will be subject to the jurisdiction of every state.
[102 N.J. at 477-481, 508 A.2d 1127 (citations and quotation marks omitted).]
Less than a year after our Supreme Court decided Charles Gendler, the United States Supreme Court decided Asahi, in which it sought to refine the boundaries of the stream-of-commerce theory. The Court split four-four-one. Writing for four members of the Court, Justice O'Connor espoused the view that the stream-of-commerce theory required a showing of an action of the defendant purposefully directed toward the forum state, and that the placement of a product into the stream of commerce, without more, would not fulfill that requirement. Asahi supra, 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104. In her view, "[a]dditional conduct of the defendant may indicate an intent or. purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Ibid. However, mere awareness that the stream of commerce might sweep the product into the forum state would not convert the mere act of *103 placing the product into the stream of commerce into an act purposefully directed toward the forum state. Ibid. Justice O'Connor pointed out that although the foreign manufacturer in Asahi might have been aware that some of its component products would be incorporated into other products ultimately sold in California, the manufacturer "did not create, control, or employ the distribution system that brought its valves to California," id. at 112-13, 107 S.Ct. at 1032, 94 L.Ed.2d at 104-05, suggesting that the result might have been different if one of those circumstances were present.
Justice Brennan, writing for four members of the Court, rejected Justice O'Connor's "additional conduct" requirement. Id. at 116-21, 107 S.Ct. at 1034-37, 94 L.Ed.2d at 107-10. In his view, the purposeful availment requirement is satisfied by placement of a product in the stream of commerce with an awareness that the final product is being marketed in the forum state, because, by definition, the stream-of-commerce "refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacturer to distributor to retail sale." Id. at 117, 107 S.Ct. at 1034, 94 L.Ed.2d at 107.
The New Jersey Supreme Court next had the occasion to consider the stream-of-commerce theory in Lebel, supra, in which it announced that until the United States Supreme Court, "as the umpire of federalism," more clearly "draws the lines" defining the theory, the New Jersey Supreme Court would "hew closely to the limited fundamentals about which there is little or no dispute or debate." 115 N.J. at 319-20, 558 A.2d 1252. The Court proceeded to decide the case, finding jurisdiction based on traditional minimum contacts principles. Id. at 321-29, 558 A.2d 1252.
This court has interpreted our Supreme Court's announcement in Lebel as not a rejection of the stream-of-commerce theory, but an admonition to avoid use of the theory as the basis for a jurisdictional decision if jurisdiction can be sustained on traditional minimum-contacts analysis. Cruz v. Robinson Engineering Corp., 253 N.J.Super. 66, 72, 600 A.2d 1238 (App. Div.), certif. denied, 130 N.J. 9, 611 A.2d 648 (1992). Judge Pressler there analyzed the disposition in Asahi and pointed out that all nine Justices agreed that because the injured plaintiffs claim against all defendants was settled, and all that remained to the litigation was an indemnification claim between two alien corporations, California's exercise of jurisdiction for the sole purpose of adjudicating that claim would offend traditional notions of fair play and substantial justice. Id. at 70-71, 600 A.2d 1238. The entire Court agreed that California's minimal interest in the remaining aspect of the dispute was outweighed by the undue litigative burden that would be placed on an alien corporation if compelled to resolve the dispute in a California court. Id. at 71, 600 A.2d 1238. As a result, the disagreement between the Justices regarding the precise parameters of the stream-of-commerce theory was somewhat minimized. Ibid.
The Eighth Circuit, based upon a similar analysis, concluded that, "Asahi [] stands for no more than that it is unreasonable to adjudicate third-party litigation between two foreign companies in this country absent consent by the nonresident defendant." Barone, supra, 25 F.3d at 614. The court noted, "`Because the [United States] Supreme Court established the stream of commerce theory, and a majority of the court has not yet rejected it, we consider that theory to be determinative.'" Ibid, (quoting Dehmlow v. Austin Fireworks, 963 F.2d 941, 946 (7th Cir.1992)).
We agree that the stream-of-commerce theory remains viable, and note that *104 it "has achieved fairly wide acceptance in the federal courts." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed.Cir.1994). We are unable in this case to conclude that application of traditional minimum contacts principles will result in a finding of jurisdiction. Accordingly, because we are convinced that the stream-of-commerce theory remains viable, we apply it.
While some courts have utilized Justice Brennan's pure stream-of-commerce rationale, we find it unnecessary to do so in this case. Instead, we follow those courts that have taken the more cautious approach by applying Justice O'Connor's more restrictive rationale, which has come to be known as "stream-of-commerce plus." See 16 James W. Moore, et al., Moore's Federal Practice  Civil § 108.42 nn. 35 & 36 (3d ed. 2008)(discussing post-Asahi federal cases adopting Justice O'Connor's "stream-of-commerce plus" rationale as compared to federal cases adopting Justice Brennan's traditional stream-of-commerce theory). The more restrictive approach, of course, encompasses the less restrictive one.
Therefore, in order to determine whether New Jersey courts have personal jurisdiction over defendant, we must evaluate whether defendant, in addition to placing the shear machine that injured plaintiff into the stream of commerce by transferring it to its distributor, McIntyre America, with an awareness that its machine might end up in New Jersey, also engaged in additional conduct indicating an intent or purpose to serve the New Jersey market. Asahi, supra, 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104.
Defendant designated McIntyre America as its exclusive distributor for the entire United States. Therefore, anyone in any state that wished to purchase one of defendant's machines was required to purchase it from McIntyre America, defendant's exclusive sales agent in this country. This was not a temporary or fleeting arrangement. From at least as early as 1995, when Curcio purchased the machine, until its bankruptcy in 2001, McIntyre America enjoyed this relationship with defendant on an ongoing basis. The relationship was established by defendant for the purpose of selling its machines in all fifty states. The machines were designed to conform with United States standards as well as those in the United Kingdom. McIntyre America traded on defendant's name and held itself out as "America's Link to Quality Metal Processing Equipment."
Defendant attempts to avoid a finding of sufficient minimum contacts because (1) McIntyre America was a separate and independent business entity, (2) McIntyre America, not defendant, sold the machines to customers (including Curcio), and (3) defendant had no knowledge of the identity or whereabouts of the customers to whom McIntyre America sold. We reject defendant's arguments.
Defendant was well aware that McIntyre America was not the end user of the many machines it sold to McIntyre America over the years. By definition, McIntyre America was defendant's distributor and its function was to resell the machines to end users. These are large, potentially dangerous, industrial machines, designed for a limited market of users engaged in the metal recycling industry. The machines are designed for use in a stationary location in an industrial setting. Thus, it would reasonably be anticipated by defendant and McIntyre America that upon sale to the end user, the machine would remain at its location for use by workers there.
When defendant sold and shipped machines to McIntyre America in Ohio, defendant did not do so with the purpose of *105 availing itself of the Ohio market. When defendant's senior management personnel attended trade conventions in Las Vegas and other United States cities to display its machines and seek buyers for them (through McIntyre America), its purpose was not to sell machines for use in Las Vegas or those other cities. Defendant was engaged in purposeful conduct to avail itself of the entire United States market, namely to effect sales, through its exclusive distributor, to end users in all fifty states, including New Jersey.
The sale of the machine to Curcio was not the result of conduct by a party unrelated to defendant and it was not an isolated transaction. It was the result of the very distribution scheme purposefully established by defendant for the sale of its machines to potential customers located anywhere within the exclusive sales territory of McIntyre America. That territory included New Jersey.
Applying Justice O'Connor's stream-of-commerce formulation in similar situations, courts have held that sales by distributors to customers within their distribution territory, pursuant to distribution arrangements established by the manufacturer, exposed the manufacturer to specific in personam jurisdiction for claims arising out of those sales. This is the very type of "additional conduct" Justice O'Connor suggested as sufficient to satisfy the purposeful availment requirement, namely "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Asahi, supra, 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104. We discuss a sampling of such cases.
The Supreme Court of Arizona found jurisdiction over an Italian firearm's manufacturer which sold guns, manufactured to meet United States specifications, to an intermediary distributor F.O.B. Milan, which then sold them to a distributor serving the United States market, which finally sold the gun that was the subject of the litigation to the end user consumer in Tucson, Arizona. A. Uberti & C. v. Leonardo, 181 Ariz. 565, 892 P.2d 1354, 1355-65 (1995). An accidental discharge of the gun killed a family member of the purchaser and defective design was alleged. Id. at 1356-57. The court rejected defendant's argument that its activities, at best, focused on the United States in general, not Arizona. Id. at 1362-64. The court stated:
Were this true, then no individual state could assert jurisdiction over Defendant simply because Defendant did not target a particular state or group of states but instead intended to sell its product to all of America. The argument turns common sense on its head. Holding that a defendant intending to sell its products to any and all citizens in the United States could not be held accountable in any jurisdiction where its products caused injury defies any sensible concept of due process. We have no doubt that Defendant did not care whether its guns were sold in Arizona, Massachusetts, or California, but it is quite clear that through its distributor Defendant contemplated serving the market throughout America. Given evidence of intent to serve this market, according to Justice O'Connor's opinion in Asahi principles of due process permit suit against Defendant in states where its products cause damage.
Hence if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of *106 those States if its allegedly defective merchandise has there been the source of injury to its owners or to others.
[Id. at 1362 (quoting Asahi supra, 480 U.S. at 110, 107 S.Ct. at 1031, 94 L.Ed.2d at 103).]
The court did "not believe that Plaintiffs must show Defendant's specific intent to sell in Arizona. An intent to sell across America is enough." Ibid Further, rejecting an argument similar to that made by defendant in the case before us, the court said, "We do not believe that a foreign manufacturer that knowingly and intentionally distributes its products in America through an American company can avoid jurisdiction of American courts by the simple expedient of closing its eyes and making no effort to learn about or restrict distributor's activities," noting that a manufacturer has the option of limiting its risk by precluding its distributor from selling its product in particular states. Id. at 1362-63.
Addressing the second prong of the due process analysis, fair play and substantial justice, the court concluded that Arizona's interest in protecting the health and safety of its residents was a substantial state interest. Id. at 1364. The accident happened in Arizona, and most witnesses and material evidence was located there. Ibid. Those important local interests far outweighed any inconvenience to the defendant in having to litigate the case in Arizona. Ibid. Accordingly, the exercise of jurisdiction was fair and reasonable. Id. at 1364-65.
Finally, the court noted a public policy consideration, namely that due process should not provide a safe harbor allowing alien corporations to ship potentially dangerous products to the United States, driving American manufacturers out of business while allowing the alien companies to produce, with immunity, dangerous products for distribution in this country. Id. at 1363.
In Fortis Corporate Insurance v. Viken Ship Management, 450 F.3d 214, 220-22 (6th Cir.2006), the court found a sufficient "plus factor" to impose jurisdiction in Ohio over a Norwegian owner of ocean-going cargo vessels because it outfitted its vessels to ship products to the Great Lakes, and its vessels did make frequent calls to Great Lakes ports over a period of years including Toledo, Ohio. The ship owner chartered a fleet of vessels to a Canadian company for several years to transport cargo on an as-needed basis. Id. at 215. The" Canadian company then subchartered the ship in question to a United States company to transport goods from Poland to Toledo and en route sea water entered the cargo hold and damaged the goods. Ibid.
The court also found the second prong satisfied. Id. at 223. Recognizing the caution to exercise great care when dealing with personal jurisdiction in the international field, the court noted that Ohio's strong interest in insuring that shipments to its ports are reliable and the plaintiffs interest in obtaining relief in an Ohio court outweighed any-inconvenience to the defendant. Ibid.
In a patent infringement case, the Federal Circuit found jurisdiction in Virginia over the Chinese manufacturer of a ceiling fan, transferred from the manufacturer to its New Jersey distributor, which then shipped it to Virginia for sale to customers through an intermediary, Builder's Square. Beverly Hills Fan Co., supra, 21 F.3d at 1559-72. The court concluded that from the ongoing relationships between the various parties in the distribution chain, "it can be presumed that the distribution channel formed by [the manufacturer and its New Jersey distributor] and Builder's *107 Square was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was Virginia." Id. at 1564. The manufacturer's sole contact with Virginia resulted from indirect shipments through the stream of commerce. Ibid. The court found that specific jurisdiction was established under either version of the stream-of-commerce theory expressed in Asahi (including, of course, Justice O'Connor's more restrictive formulation) because the Chinese manufacturer and New Jersey distributor acted "in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." Id. at 1566.
In Tobin v. Astra Pharmaceutical Products, Inc., 993 F.2d 528, 542-45 (6th Cir.), cert. denied, 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993), the court held a Netherlands drug manufacturer subject to in personam jurisdiction in Kentucky, in circumstances in which its products were submitted to the Food and Drug Administration (FDA) for approval and then distributed through its exclusive United States distributor to an end user in Kentucky. The court held that the manufacturer's direct efforts in obtaining FDA approval allowed the manufacturer "to avail itself of the vast, lucrative markets of each state in the United States." Id. at 543. The manufacturer's licensing agreement with the distributor authorized the distributor to distribute the drug that was the subject of the litigation and allegedly caused harm to plaintiff, throughout its territory, defined in the agreement as "the United States of America, its territories and possessions, and Puerto Rico." Ibid. Applying Justice O'Connor's test, the court noted that the manufacturer "made a deliberate decision to market [the drug in question] in all 50 states, including Kentucky, the forum state." Ibid. The court went on to explain that the manufacturer
did not, for example, seek a "New England regional distributor" or a distributor for specific states. It sought and obtained a distributor to market its product in each and every state. Even the Asahi plurality recognized that "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State" can "indicate an intent or purpose to serve the market in the forum State."
[Id. at 544 (quoting Asahi supra, 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104).]
The court also considered as an additional factor that the manufacturer "arguably also kept control over an essential element of the product  the package insert." Ibid.
The court concluded that the manufacturer could not expect to rely solely on the use of an independent distributor to insulate itself from suit. Id. at 544. It submitted its drug application to the FDA for approval, conducted clinical studies in the United States, and sought out a United States distributor to "exploit the United States market." Ibid. Thus, the manufacturer did not simply place its product into the stream of commerce but "purposefully availed itself of the privilege of conducting business in all states, including the state of Kentucky." Ibid. The court found misguided the manufacturer's argument that it did nothing in particular to purposely avail itself of the forum market, as distinguished from any other state: "If we were to accept defendant's argument on this point, a foreign manufacturer could insulate itself from liability in each of the fifty states simply by using an independent national distributor to market its products, *108 a result we specifically rejected in [another case]. [The manufacturer] cannot deny that by licensing [its distributor] to distribute [the drug] in all fifty states it employed the distribution system that brought [the drug] to Kentucky." Ibid.
The court also found the second prong of the due process test satisfied. Id. at 544-45. Applying the more stringent standard pertaining to international defendants, the court found that the interests of the forum state and the plaintiff were very high, in that a Kentucky resident was injured, and those legitimate and important interests outweighed any inconvenience to the alien manufacturer in having to litigate the case in Kentucky. Id. at 545.
In the case before us, defendant purposefully established a distribution scheme by which McIntyre America would serve as its conduit for sales of defendant's machines in all fifty states, including New Jersey. Crediting defendant's assertion that it did not know the identity or location of customers to whom McIntyre America sold the machines, we are nevertheless satisfied that defendant's conduct in establishing and operating under this exclusive distributorship arrangement constituted the necessary other conduct by which it purposefully availed itself of the benefits and protections of all fifty states, including New Jersey. Additionally, defendant designed the machine that is the subject of this litigation to conform to United States specifications and requirements, and represented such compliance in the instruction manual that came with the machine. Finally, senior personnel of defendant attended national trade shows in the United States, exhibiting its products jointly with its exclusive United States distributor in an effort to make sales to customers in any or all of the states of the union. Indeed, Frank Curcio attended such a show and visited the joint exhibit of defendant and McIntyre America, which provided him with the information and inducement to purchase the machine that is the subject of this case.
Considering all of the circumstances, we conclude that, under the "stream-of-commerce plus" theory, defendant engaged in purposeful conduct to avail itself of the New Jersey market, thus constituting sufficient minimum contacts with New Jersey to justify the assertion of in personam jurisdiction.
The second prong requires little discussion. Once minimum contacts are established, the burden is on the defendant to present compelling reasons why the interests of fair play and substantial justice would be violated by asserting jurisdiction. Int'l Shoe, supra, 326 U.S. at 316, 66 S.Ct at 158, 90 L.Ed. at 102. Consideration should be given to several factors in determining the reasonableness of the exercise of jurisdiction in each case, including the burden on the defendant, the interests of the forum state, the plaintiffs interest in obtaining relief, the interest of the interstate judicial system in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. World-Wide Volkswagen, supra, 444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 498. In this case, dealing with an alien defendant, we must also be mindful of the need to give great care to the reasonableness inquiry. Asahi, supra, 480 U.S. at 115, 107 S.Ct. at 1034, 94 L.Ed.2d at 106-07.
New Jersey has a very strong interest in providing a forum for its injured workers who sustain industrial accidents here. Cruz, supra, 253 N.J.Super. at 74, 600 A 2d 1238. Plaintiff, of course, shares that interest. New Jersey law will apply in this products liability action. Ibid. The machine is here, as are plaintiff, his medical *109 providers and others who will be witnesses, and his employer, the buyer of the machine. Ibid.
While litigating the case in New Jersey will cause some inconvenience to defendant, it has shown no lack of ability to litigate the jurisdictional aspects of this case, and the record reveals that it is defending several other cases in various states around the country. By its direct dealings with McIntyre America in Ohio and its attendance at the trade show attended by Frank Curcio in Nevada, defendant may well have been subject to specific jurisdiction in either of those states for the injury caused by this machine, and defendant should have been fully aware of that possibility. Certainly, New Jersey is no more inconvenient to defendant for the litigation than either of those states. And, considering defendant's willingness to travel to the United States to iron out distribution issues with McIntyre America and to promote sales of its machines at trade shows, we do not deem it unfair or unreasonable to expect it to travel here to respond to claims arising out of the use of its machines.
We have no hesitancy in concluding that subjecting defendant to the jurisdiction of the courts of New Jersey does not offend traditional notions of fair play and substantial justice.
Reversed and remanded.
NOTES
[1] The order dismissing the complaint now under review was entered on November 3, 2006. A prior order, entered on March 5, 2004, dismissed the complaint for lack of personal jurisdiction. Plaintiffs appealed and we reversed and remanded to allow jurisdictional discovery. Nicastro v. McIntyre Mach. Am., Ltd., No. A-3891-03T1 (App.Div. May 26, 2005). After that discovery was conducted, defendant again moved for dismissal, which was granted by the November 3, 2006 order.