49 A.3d 428

IN THE MATTER OF THE LIQUIDATION OF INTEGRITY
INSURANCE COMPANY/SEPCO CORPORATION.

IN THE MATTER OF THE LIQUIDATION OF INTEGRITY
INSURANCE COMPANY/MINE SAFETY APPLIANCES
COMPANY.

Superior Court of New Jersey
Appellate Division

Argued May 22, 2012—Decided August 23, 2012.

Before Judges PAYNE, SIMONELLI and HAYDEN.

*Richard D. Shore* (*Gilbert, L.L.P.*) of the D.C. Bar, admitted pro hac vice, argued the cause for appellant Sepco Corporation (*The Killian Firm, P.C.*, and *Mr. Shore*, attorneys; *Ryan Milun, Eugene Killian, Jr., Jonathan M. Cohen* (*Gilbert, L.L.P.*) of the D.C. Bar, admitted pro hac vice, and *David B. Killalea* (*Gilbert, L.L.P.*) of the D.C. Bar, admitted pro hac vice, on the briefs).

*Jay M. Levin* argued the cause for appellant Mine Safety Appliances Company (*Reed Smith L.L.P.*, attorneys; *Mr. Levin* and *Jennifer D. Katz*, on the briefs).

*Daniel Hargraves* (Hargraves McConnell & Costigan, P.C.) of the New York Bar, admitted pro hac vice, argued the causes for respondent *Thomas B. Considine*, Commissioner of Banking and Insurance of the State of New Jersey in his capacity as Liquidator of Integrity Insurance Company (*Golub & Isabel, P.C.*, and *Mr. Hargraves*, attorneys; *Thomas J. Perry* and *Mr. Hargraves*, on the briefs).

The opinion of the court was delivered by

PAYNE, P.J.A.D.

These two appeals, which were argued back-to-back, raise the same issue of the application of conflict of law principles to breach of contract actions filed by claimants Sepco Corporation and Mine Safety Appliances Company (MSA) against Integrity Insurance Company in Liquidation, following the denial of the claims of each by Integrity's Liquidator, as based on an improper method of allocating loss, and the affirmance of the Liquidator's decision by the Special Master and the trial court overseeing the liquidation. Specifically, the appeals present the question whether New Jersey's pro-rata approach to allocation of coverage among triggered insurers should be applied to the present claims, or whether, under choice of law principles, a joint and several or "all-sums" approach to allocation, adopted in the states in which claimants are incorporated and maintain their principal places of business, is applicable. The choice of law question is relevant, because it is the key to a determination whether the Liquidator breached the contracts between Integrity and the claimants when he denied payment.

Because the issues raised in the two appeals are virtually identical, we have determined to decide them in a single opinion, in which we affirm the orders entered in the matters.

I.

We commence our opinion with a brief description of each claimant, the claims asserted by it, and their resolution, to date.

A. *Sepco Corporation*

Sepco is a California corporation that manufactured packing products and gaskets containing asbestos in the period from 1970 to 1979. Since 1989, more than 188,000 suits have been instituted against it alleging injury as the result of asbestos-related disease. Sepco has settled approximately 127,000 of the claims for a total of approximately $51.5 million, with $20.8 million in indemnity payments and $30.7 million in defense costs.

In 1985, Sepco's parent company purchased an Integrity policy of excess insurance that covered the period from January 1, 1985 to January 31, 1986, offering coverage of a $3 million [1] part of an $8 million excess layer over $11 million in underlying insurance. The policy was purchased in California through two California-based insurance brokers.

The Integrity policy, which followed the form of underlying coverage, provided indemnification for "ultimate net loss" in excess of the limits of underlying insurance. The policy excluded "costs," including legal expenses, from ultimate net loss, but in a separate provision, offered coverage for such costs under certain conditions. There is no evidence in the record that Sepco met those conditions.

In accordance with the Amended Liquidation Closing Plan promulgated by Integrity's Liquidator, on September 29, 2009, Sepco filed a proof of claim for coverage under Integrity's policy seeking $6 million in indemnity payments and $21,871,009.83 in defense costs. On December 3, 2009, Integrity issued a notice of determination (NOD) disallowing the claim as the result of insufficient supporting documentation, failure to document the exhaustion of underlying limits of coverage, and the utilization of an unacceptable "all-sums" allocation methodology to support the position that Integrity's policy was triggered. Sepco objected to the determination, and the matter was referred to the Special Master, who on September 2, 2010, issued a decision upholding the NOD.

In reaching his decision, the Special Master looked to the *Restatement (Second) of Conflict of Laws (Restatement)* § 193 (1988), and concluded that application of that provision to the facts of the matter required him to analyze the choice of law issue that

---

[1] There is a dispute whether the policy offered coverage of $3 million or, because the policy period extended for more than one year, the coverage was $6 million. In light of our decision to affirm the order of the trial court, we need not resolve that dispute.

was presented by Sepco's reliance on California law for allocation purposes pursuant to the considerations set forth in § 6 of the *Restatement.* First focusing on the competing interests of the states involved, as required by § 6, and evaluating those interests in the context of Integrity's liquidation—a matter conducted pursuant to New Jersey's version of the Uniform Insurers Liquidation Act (UILA), *N.J.S.A.* 17:30C–1 to –31—the Special Master determined that New Jersey had a compelling interest in having its own law applied to the liquidation proceeding because it was only in that fashion that it could effectuate the purpose of the UILA " 'to provide for a uniform, orderly and *equitable* method of making and processing claims against financially troubled insurers and to provide for fair procedures for rehabilitating the business of such insurers and, if necessary, distributing their assets.' " *IMO Rehabilitation of Mut. Benefit Life Ins. Co.*, 258 *N.J.Super.* 356, 368, 609 *A.*2d 768 (App.Div.1992) (emphasis supplied). The Special Master further concluded that Sepco's approach sought "to give an unfairly disproportionate portion of Integrity's limited assets to foreign creditors from certain states at the expense of New Jersey and other similarly situated creditors," and it was therefore "not equitable."

In evaluating the interests of commerce among the states and the parties, additional factors set forth in § 6, the Special Master found that application of New Jersey law would not frustrate either. Sepco, he held, had been provided with insurance coverage under the Integrity policy, and it had no justified expectation that California's all-sums allocation approach would apply to that coverage. Thus application of New Jersey law would not interfere with the interests of commerce or Sepco's justified expectations.

As a final matter, the Special Master considered the interests of judicial administration, determining that, by applying New Jersey law, the court could most efficiently and fairly effect the equitable distribution of Integrity's remaining assets as the Legislature sought by its passage of the UILA.

On appeal to the trial court, the Special Master's views were confirmed as thorough and well reasoned. The Court held in a rider to its December 3, 2010 order "that New Jersey substantive law controls as the state has a more significant relationship to the liquidation. Integrity is being liquidated pursuant to [the] New Jersey UILA, and therefore that New Jersey law must control the proceedings."

## B. *Mine Safety Appliances Company*

MSA is a Pennsylvania manufacturer of respiratory protection products that maintains its principal place of business in Pittsburgh. MSA obtained $5 million in coverage from Integrity, effective from April 1, 1984 to April 1, 1985, that was excess to primary insurance in the amount of $1.5 million issued by Travelers Indemnity Company. MSA negotiated for the purchase of the policy with Integrity, a New Jersey company, in Pennsylvania, through a Pennsylvania broker. The policy was delivered in Pennsylvania.

Like Sepco, on September 29, 2009, MSA submitted a claim to Integrity's Liquidator for $5,176,045.50, which encompassed a $4 million settlement with one individual and a $1 million settlement with a second individual, both Kentucky residents who claimed they had contracted coalminer's pneumoconiosis as the result of defective respiratory equipment. The remainder of the claim was for defense costs. MSA claimed that the underlying Travelers coverage had been exhausted.

On January 12, 2010, the Deputy Liquidator recommended that the claim be disallowed as the result of insufficient supporting documentation, a basis for denial that was later withdrawn, and for utilizing an unacceptable all-sums allocation methodology. After MSA contested the Liquidator's decision, the matter was referred to the Special Master who, in a decision issued on April 8, 2011, which was substantively identical to the one issued in Sepco, affirmed the Liquidator's determination.

Upon further appeal, the Special Master's decision was affirmed in an order, dated June 10, 2011, which had appended to it a rider couched in the same language as that appended to the order in the Sepco matter. However, the order did note that a claim by MSA in the amount of $258,581.05 that had been calculated pursuant to a pro-rata allocation methodology had been accepted by the Liquidator.

Both claimants appealed, contesting the choice of New Jersey law as governing their breach of contract actions.

## II.

In evaluating the issue presented, we are satisfied that an actual conflict exists between the laws of New Jersey, California and Pennsylvania, the states of concern in this case. *Pfizer, Inc. v. Emp'rs Ins. of Wausau,* 154 *N.J.* 187, 199, 712 *A.2d* 634 (1998) (a court must make a choice of law decision only when the case is connected to more than one state and the laws of the involved states differ on the point in issue). All three states have adopted a continuous trigger of coverage to cases, such as the underlying actions here, that involve progressive, indivisible injury or damage, thereby activating each insurer's obligation to respond under the terms of its policy from the date of first exposure, through exposure in residence, to manifestation. *Owens–Illinois, Inc. v. United Ins. Co.,* 138 *N.J.* 437, 478–79, 650 *A.2d* 974 (1994); *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 *Cal.*4th 645, 42 *Cal.Rptr.*2d 324, 913 *P.*2d 878, 904 (1995); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.,* 45 *Cal.App.*4th 1, 47, 52 *Cal.Rptr.*2d 690 (Ct.App.), *review denied,* 1996 *Cal. LEXIS* 4708 (Cal.1996); *J.H. France Refractories Co. v. Allstate Ins. Co.,* 534 *Pa.* 29, 626 *A.2d* 502, 506–07 (1993).

Under a continuous trigger, "the same claim may trigger more than one policy." James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate Over the Appropriate Trigger Rule,* 45 *Drake L.Rev.* 625, 647 (1997). However, as indicated previously, the method used by New Jersey courts to

allocate continuous trigger claims among implicated policies differs from that used in California and Pennsylvania.

New Jersey rejected a joint-and-several allocation methodology in *Owens–Illinois, supra,* 138 *N.J.* at 459–62, 650 *A.*2d 974, in favor of a pro-rata allocation methodology that takes into consideration both the insurer's time on the risk and the degree of risk that is assumed. *Id.* at 462–64, 650 *A.*2d 974. In contrast, California and Pennsylvania have adopted a joint-and-several or all-sums allocation approach that permits the insured to recover in full under any triggered policy that it chooses and leaves the selected insurer to pursue cross-claims against other carriers whose policies are also available. *Dart Indus., Inc. v. Commercial Union Ins. Co.,* 28 *Cal.*4th 1059, 124 *Cal.Rptr.*2d 142, 52 *P.*3d 79, 93 (2002); *Armstrong, supra,* 45 *Cal.App.*4th at 57, 52 *Cal.Rptr.*2d 690; *J.H. France, supra,* 626 *A.*2d at 507–09.

■ As we have explained:

The principal differences between the two approaches are (1) under a pro-rata approach, the insured bears the risk of loss in periods in which no insurance was in force, whereas under the joint-and-several approach, the insured bears no risk until coverage is wholly exhausted, and (2) under a pro-rata approach, the coverage obligations of triggered carriers are determined at the outset, whereas under a joint-and-several approach, a designated triggered carrier can spread the risk only by paying the claim and then seeking contribution from other triggered carriers.

[*Century Indem. Co. v. Mine Safety Appliances Co.,* 398 *N.J.Super.* 422, 429, 942 *A.*2d 95 (App.Div.2008).]

■ Addressing the manner in which that conflict should be resolved,[2] the claimants argue that the Special Master and the

---

[2] In Sepco's appeal, Integrity argues for the first time that Sepco cannot show the exhaustion of all underlying insurance regardless of coverage year, as it must to reach Integrity's coverage, and thus the conflict issue need not be reached. *See Cmty. Redevelopment Agency v. Aetna Cas. & Sur. Co.,* 50 *Cal.App.*4th 329, 339, 57 *Cal.Rptr.*2d 755 (Ct.App.1996). We decline to address this late-asserted argument except to note that "[i]f an excess policy states that it is excess over a specifically described policy and will cover a claim when that specific primary policy is exhausted, such language is sufficiently clear to overcome the usual presumption that all primary coverage must be exhausted." *Id.* at 340 n. 6, 57

trial court improperly focused their conflict of law analyses on which state had a more significant relationship to Integrity's liquidation, rather than on the breach of contract claims that each claimant was asserting. Addressing that argument, we agree that the focus must be on the contract that existed between Integrity and each of the claimants.[3] But we do not think that the issue of whether these contracts were breached in these particular cases—the ultimate question that our choice of law analysis is employed to resolve—can be entirely divorced from the fact that Integrity is in liquidation. That is, after all, the context in which the issue has arisen, and we find it would be improvident to entirely ignore that fact. We thus will strive to let the circumstances of this case inform but not overwhelm our analysis.

 As we view the matter, the existence of a contract between Integrity and the claimants gave rise to contingent liability. Whether that liability had matured, on the date of claim, into a payable debt upon which Integrity defaulted depends on which state's view of that issue is applicable.[4] As the result of the following analysis, we adopt New Jersey's position that liability remained contingent, and therefore affirm the order entered in the trial court.

In reaching a decision in this matter, we are directed to consider each state's relationship to the parties and to the issues

---

*Cal.Rptr.*2d 755. We find that degree of specificity to exist in the present case. Accordingly, were we to consider Integrity's position, we would reject it.

[3] We thus agree with the New York Court of Appeals that it would be improper to adopt a blanket rule recognizing the applicability of the law of the domicile of the insolvent insurer to this stage of the claims procedure. *In the Matter of the Liquidation of Midland Ins. Co.,* 16 *N.Y.*3d 536, 923 *N.Y.S.*2d 396, 947 *N.E.*2d 1174, 1180 (2011).

[4] In this regard, we note that contracts of insurance contain a promise to pay. But so long as there are no claims that meet the policy's conditions for payment, no contractual obligation on the part of the insurer arises. It is only when the policy's conditions are satisfied that the duty to pay ripens. At issue here is whether the conditions, as construed by the courts, have been satisfied.

under principles established, as the Special Master recognized, by *Restatement* §§ 193 and 6. Section 193, which deals specifically with contracts of fire, surety, and casualty insurance, provides that the rights created by such contracts

> are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

We agree with the Special Master that, in light of the nature of the legal actions for which claimants seek payment—product liability suits with no particular connection to the claimants' states of domicile—an analysis employing the factors set forth in section 6 is required.

Section 6 specifies that

> the factors relevant to the choice of the applicable rule of law include
>
> (a) the needs of the interstate and the international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

The New Jersey Supreme Court has distilled these factors into the following four:

> 1. The competing interests of the states, which requires "courts to consider whether application of a competing state's law *under the circumstances of the case* 'will advance the policies that the law was intended to promote'";
>
> 2. The interests of commerce among the states, which requires "courts to consider whether application of a competing state's law would frustrate the policies of other states";
>
> 3. The interests of parties, which requires "courts to focus on their justified expectations and their needs for predictability of result"; and
>
> 4. The interests of judicial administration, which requires "a court to consider whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen."
>
> [*Pfizer, supra,* 154 *N.J.* at 198–99, 712 *A.*2d 634 (emphasis supplied; citation omitted).]

█ Turning to the first factor, we must consider whether application of Pennsylvania and California precedents adopting an all-sums allocation approach will advance, in the circumstances of this case, the policies that those states' precedents were intended to promote. "The focus of this inquiry should be on what policies the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation." *Id.* at 198, 626 *A.*2d 502 (internal quotation marks and citation omitted). Consequently, under this factor, we must consider whether, under the circumstances of this case, application of an all-sums methodology to determine whether Integrity's contractual obligations have ripened advances the policies behind the adoption of the all-sums method of allocation.

The all-sums approach arose from the courts' construction of the insuring clauses of the contracts before them providing that the insurer was obligated to "pay on behalf of the Insured *all sums* which the Insured shall become legally obligated to pay as damages because of bodily injury to which this insurance applies." [5] (Emphasis supplied.) Courts adopting this approach held that this provision required the payment of all sums, not some pro-rata portion. *J.H. France, supra,* 626 *A.*2d at 507–08; *Armstrong, supra,* 45 *Cal.App.*4th at 49–50, 52 *Cal.Rptr.*2d 690. And because of the courts' adoption of a continuous trigger, any carrier could be held liable to respond in full. As the court explained in *Keene Corporation v. Insurance Company of North America,* 667 *F.*2d 1034 (D.C.Cir.1981), *cert. denied,* 455 *U.S.* 1007, 102 *S.Ct.* 1644, 1655, 71 *L.Ed.*2d 85 (1982), the seminal decision cited as authoritative precedent in both *J.H. France, supra,* 626 *A.*2d at 507, and *Armstrong,* 45 *Cal.App.*4th at 49–50, 52 *Cal.Rptr.*2d 690:

---

[5] Alternatively, policies provided: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... caused by an occurrence." " 'Occurrence' means an accident, including injurious exposure to conditions, which results during the policy period in bodily injury...."

In any suit against Keene for an asbestos-related disease, it is likely that the coverage of more than one insurer will be triggered. Because each insurer is fully liable, and because Keene cannot collect more than it owes in damages, the issue of dividing insurance obligations arises. The only logical resolution of this issue is for Keene to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provision in the policies that govern the allocation of liability when more than one policy covers an injury. That is the only way that Keene can be assured the security that it purchased with each policy.

[*Keene, supra*, 667 *F*.2d at 1050.]

However, as Integrity notes, the policy that it issued to Sepco does not contain the all-sums language upon which all-sums precedent depends. Rather, its insuring agreement provides:

The Company hereby indemnifies the Insured against ultimate net loss in excess of and arising out of the hazards covered and as defined and in excess of the underlying insurance as shown in Item 3 of the Declarations. . . .

"Ultimate Net Loss," in turn, is defined in a somewhat circular manner as:

the sums paid in settlement of losses for which the Insured is liable after making deductions for all recoveries, salvages and other insurances . . . and shall exclude all "Costs."

And although the policy that Integrity issued to MSA a year earlier does contain the phrase "all sums," it is modified by reference to ultimate net loss as follows:

In consideration of the payment of the required premium, the Company hereby agrees, subject to all of the terms of this policy, to pay on behalf of the Insured all sums, as more fully defined by the term ultimate net loss, for which the insured shall become obligated to pay by reason of liability

(a) imposed upon the Insured by law or

(b) assumed under contract or agreement by the Insured, arising out of personal injury, property damage or advertising liability caused by an occurrence.

"Ultimate net loss" is defined in that policy as

the amount of the principal sum, award or verdict, actually paid or payable in cash in the settlement or satisfaction of claims for which the Insured is liable, either by adjudication or compromise with the written consent of the company, after making proper deduction for all recoveries and salvages.

Although there is federal precedent predicting that Pennsylvania would interpret ultimate net loss to be the equivalent of all sums, *Koppers Company, Inc. v. The Aetna Casualty and Surety*

*Company,* 98 *F.*3d 1440, 1450 (3d Cir.1996), neither California nor Pennsylvania has construed this language. While we can speculate that those states' courts will follow the conclusion reached in *Koppers,* it is certainly reasonable to conclude that, given the policy language at issue here, the states' interest in ensuring that an all-sums methodology be utilized is somewhat lessened.

Moreover, although it is clear that, in both *J.H. France* and *Armstrong,* the courts' interest was in ensuring that companies purchasing insurance that were domiciled in their respective states received the benefit of their bargains, *see J.H. France, supra,* 626 *A.*2d at 508; *Armstrong, supra,* 45 *Cal.App.*4th at 56–57, 52 *Cal.Rptr.*2d 690, their determinations to require a single triggered insurer to respond to a claim were tempered by the recognition that the insurer (whether in-state or out-of-state) could effect a pro-rata distribution of the risk through the operation of other insurance provisions and equitable principles. *See J.H. France, supra,* 626 *A.*2d at 509 (" 'This does not mean that a single insurer will be saddled with full liability for any injury. When more than one policy applies to a loss, the "other insurance" provisions of each policy provide a scheme by which the insurers' liability is to be apportioned.' " (quoting *Keene, supra,* 667 *F.*2d at 1050)); *Armstrong, supra,* 45 *Cal.App.*4th at 49, 52 *Cal.Rptr.*2d 690.

At this stage of the liquidation of Integrity, a process that has already consumed twenty-five years and after an Amended Liquidation Closing Plan has been promulgated and largely implemented,[6] it would be unreasonable for the Liquidator to attempt to

---

[6] Integrity's website contains the following notice, posted February 2, 2012:

Due to the recent resolution of several objections, we are now in a position to bring all Priority 4 non-guaranty association creditors, whose claims were allowed from September 1, 2009 to December 31, 2011, to the currently approved 70% distribution rate. Correspondence to those creditors affected by this distribution will commence in the latter part of February.

There are still 8 objecting creditors with claims at various stages of the appellate process. We are hopeful of a final resolution of these matters

obtain the recoveries anticipated by courts adopting the all-sums approach to allocation. As a consequence, that approach can only be applied imperfectly, in the present matter, at best—a factor that we consider in weighing the interests of California and Pennsylvania in this matter.

Because we are evaluating the "competing" interests of the states, we must look as well to New Jersey's interest in the insurance contracts at issue. But for the fact that Integrity was domiciled in New Jersey and it is presently in liquidation, New Jersey would have no real interest in Sepco's and MSA's policies. But, we cannot ignore the fact that, in these cases, claims have not been presented to Integrity, but rather to Integrity's Liquidator. In these circumstances, New Jersey maintains an interest in the issue of whether the claims have ripened and payment is required to avoid a breach of contract—a matter implicating New Jersey's choice of a theory of pro-rata distribution to resolve the issue of allocation. *See Pfizer, supra,* 154 *N.J.* at 198, 712 *A.*2d 634 (stating that " 'if a state's contacts with the transaction are not related to the policies underlying its law, then that state does not possess an interest in having its law apply.' " (citation and bracketing omitted)).

The Liquidator argues on appeal in language that we quote from his brief in MSA that "New Jersey has a compelling interest in applying a pro-rata allocation methodology to insolvent insurance companies being wound up under its jurisdiction." This is so, he claims, because once an insurer such as Integrity has been declared insolvent, New Jersey has "a paramount interest in treating Integrity's creditors equitably and prohibiting the waste of resources entailed by paying certain of its policyholders amounts due from the policyholders' other insurers."

---

during 2012 and to be in a position to calculate and make our final distribution in 2013.

*See* http://iicil.org (last visited on August 8, 2012).

New Jersey adopted the pro-rata approach as a "fair method of allocation" based upon "the time on the risk and the degree of risk assumed." *Owens–Illinois, supra,* 138 *N.J.* at 479, 650 *A.*2d 974. Similarly, one of the purposes of the UILA is "to provide for a uniform, orderly and equitable method of making and processing claims against financially troubled insurers and to provide for fair procedures for . . . distributing their assets." *In re Mut. Benefit, supra,* 258 *N.J.Super.* at 368, 609 *A.*2d 768. Although this purpose does not automatically preclude the application of out-of-state law in a New Jersey liquidation proceeding, the substantive law that the claimants seek to apply here has a direct effect on this fundamental purpose of the UILA, and thus we must consider this purpose in our conflict of law analysis.

If we were to apply an all-sums allocation approach, thereby triggering Integrity's liability for the face amount of Sepco's and MSA's claims, without the realistic probability of recoupment, and in circumstances in which both claimants have other available insurance, we would seriously violate New Jersey's policy of equitable distribution of the assets marshaled through the liquidation proceeding. On the other hand, in the circumstances presented, a contrary position would not seriously undermine policies established under California and Pennsylvania law that may be inapplicable to the present insurance and can only be partially effectuated because of the practical impossibility of recovery of overpayments by the Liquidator. As a consequence, we find, after evaluation of the first factor, that it favors New Jersey.

We next turn to an evaluation of the interests of commerce among the states, a process that requires us to "consider whether application of a competing state's law would frustrate the policies of other states." *Pfizer, supra,* 154 *N.J.* at 198, 712 *A.*2d 634. Because that analysis implicates the same considerations that we have just discussed, we find no need for further consideration of this factor, except to note that, in MSA, the injured claimants were residents of Kentucky—a state that has not figured in our analysis. Since no party suggests that Kentucky law is potentially

applicable here, we will maintain our focus on New Jersey, California and Pennsylvania.

The third factor requires an evaluation of the interests of the parties, "their justified expectations and their needs for predictability of result." *Id.* at 199, 712 *A.*2d 634. Without doubt, both Sepco and MSA anticipated at the time that they purchased their Integrity policies that the coverage they provided would be governed by the law of their respective domiciliary states. As a result, each could have reasonably anticipated that, upon satisfying the conditions for coverage set forth in their policies as interpreted by the courts, payments would be made. Although the Keene decision adopting an all-sums approach was issued in 1981, for many years thereafter the issue of the proper method of allocation continued to be contested. As a consequence neither Sepco nor MSA could have anticipated at the time that they purchased their policies that an all-sums allocation approach would be recognized in their states as applicable. Lacking any information to the contrary, we will also assume that neither Sepco nor MSA anticipated Integrity's insolvency, which was declared in December 1986, shortly after claimants' coverages expired, or the potential interjection of New Jersey legal concepts into the interpretation of the insurance provided to each. We therefore find that this factor favors the application of California and Pennsylvania law to the present disputes.

However, evaluation of the final factor, the interests of judicial administration, *id.* at 199, 712 *A.*2d 634, once again favors the application of New Jersey law to the contracts at issue. As stated in *Pfizer,* this factor

require[s] a court to consider whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen. In other words, what choice of law works best to manage adjudication of the controversy before the court.

[*Ibid.*]

The Liquidator argues that this factor tips heavily in favor of the application of New Jersey law, because utilization of an all-

sums approach would either create the need for extended ancillary litigation, or an inequity as the result of the inability to practically conduct such litigation. On the other hand, the claimants take the position that the application of foreign law would in no meaningful way impede in the administration of the Integrity estate. However, for the reasons that we have repeatedly stated, we reject the claimants' position on this issue.

In summary, we are satisfied that conflict of law principles permit the construction of Integrity's contractual obligation as a contingent one that has not vested in accordance with New Jersey law.[7] We thus affirm the denial of Sepco's and MSA's claims. As the result of our conclusion on this issue, we find it unnecessary to address the other matters raised in the parties' briefs.

Affirmed.

---

[7] In reaching this conclusion we have considered and rejected the position of the Missouri Supreme Court in *Viacom, Inc. v. Transit Cas. Co.*, 138 *S.W.*3d 723 (Mo.2004), finding it to have been inadequately supported by a discussion of choice of law principles.